George DEL VECCHIO, Petitioner–Appellant, Cross–Appellee,

v.

ILLINOIS DEPARTMENT OF CORRECTIONS, Respondent–Appellee, Cross–Appellant.

Nos. 92–2553, 92–2622.

United States Court of Appeals, Seventh Circuit.

Argued May 5, 1993.

Decided Oct. 26, 1993.

Argued En Banc Feb. 8, 1994.

Decided July 19, 1994.

---

Matthew F. Kennelly (argued), Margaret L. Paris, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for George Del Vecchio.

Arleen C. Anderson, Asst. Atty. Gen. (argued), Terence M. Madsen, Asst. Atty. Gen., Office of the Atty. Gen., Criminal Appeals Div., Sara Dillery Hynes, Renne G. Goldfarb, Cook County State's Atty., Civil Div., Chicago, IL, for Illinois Department of Corrections.

Before POSNER, Chief Judge, and CUMMINGS, BAUER, CUDAHY, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.*

* Hon. Joel M. Flaum did not participate in the argument or decision in this case.

MANION, Circuit Judge, joined by POSNER, BAUER, COFFEY, EASTERBROOK, and KANNE.

An Illinois state court sentenced George Del Vecchio to death after convicting him of murdering a six-year-old boy. He filed a petition for writ of habeas corpus in the district court, claiming that the proceedings leading to his death sentence were constitutionally deficient. The district court denied all of Del Vecchio's constitutional claims except one: the district court determined that Del Vecchio was entitled to an evidentiary hearing to test the voluntariness of a confession he had given for an earlier murder. Both Del Vecchio and Illinois appeal the district court's decision. We affirm the portion of the district court's decision denying the petition, but reverse the district court's remand for an evidentiary hearing.

## I. Background

This appeal involves George Del Vecchio's 1979 murder conviction and death sentence. But this was his second murder. The first occurred in early February of 1965, while Del Vecchio and two young companions were on a two-day crime spree. On the second day, they happened upon Fred Christiansen, an elderly man, whom they decided to murder and rob. Del Vecchio shot Mr. Christiansen nine times, as his accomplices kicked the dying man to silence his cries for help. They recovered $11 from Mr. Christiansen's wallet. The police arrested Del Vecchio, and he admitted to the murder.

The crime received enormous publicity in the Chicago area. Del Vecchio claimed that he was looking for drug money when he killed Mr. Christiansen. In 1965 it was still front-page news when young men committed random acts of violence to gain drug money. The Cook County State's Attorney handled the prosecution. Louis Garippo was the chief of the criminal division in that office. He assigned the case to his former trial partner, and generally supervised the prosecution. Del Vecchio provided the prosecutors with a written confession. According to Del Vecchio, he was not advised of his right

to counsel in the manner prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which was decided the following year.

Del Vecchio was sixteen years old when he murdered Mr. Christiansen in early February of 1965. He was to turn seventeen on March 1, 1965. His lawyer considered it important that Del Vecchio be convicted and sentenced before his seventeenth birthday. That way, Del Vecchio would be sent to a youth correctional facility until his twenty-first birthday. Only then would he be given an adult sentence and sent to an adult prison. Ill.Rev.Stat. Ch. 1963, 23 § 2523. By contrast, a person sentenced after his seventeenth birthday would immediately receive an adult sentence and be sent to an adult prison. Del Vecchio's attorney met with Louis Garippo and told him that Del Vecchio would plead guilty and agree to immediate sentencing if the case could be wrapped up before March 1. Garippo agreed to expedite the indictment, welcoming such a quick resolution of the high-profile case.

Del Vecchio was charged as an adult; he pleaded guilty and was sentenced before his seventeenth birthday. Because he was sentenced before turning seventeen, he was given over to the Illinois Youth Commission which placed him in a youth correctional facility. After he reached age twenty-one, Del Vecchio was sent back to court to receive an adult sentence. The presiding judge had broad discretion when sentencing the admitted murderer. He could have sentenced Del Vecchio to a minimum of fourteen years or a maximum of life in prison. The parties do not dispute that this is exactly the range of discretion a judge in 1965 would have had if Del Vecchio had been sentenced after his seventeenth birthday. During his stay at the youth facility, Del Vecchio had achieved a sterling record and the judge apparently took that into consideration. He sentenced Del Vecchio to the statutory minimum of fourteen years in an adult prison. He was credited with time served and since he continued to be a model inmate, he was paroled in April of 1973, only a few years after he had been sentenced.

Unfortunately, Del Vecchio's good behavior ended at the prison exit. In 1977, he struck again. This time his victim was six-year-old Tony Canzonieri. Early one morning, Del Vecchio broke into the apartment of Karen Canzonieri, Tony's mother, apparently intending to rape her. Del Vecchio knew Karen. In fact, he had made a visit to the apartment the night before, where he and others had smoked marijuana. When he broke into the apartment the next morning, he came across young Tony on the first floor. Apparently Del Vecchio did not want Tony in the way when he was with Karen, so he killed him. He brutally slashed the boy's throat, severing his trachea, carotid artery, jugular vein and vegus nerve, and fracturing his third and fourth vertebrae—a near decapitation. Del Vecchio then stuffed Tony's body in a crawlspace and made his way upstairs to Karen's bedroom, where he raped her. Karen was able to escape and call the police when Del Vecchio left her alone for a moment. When the police arrived they found Del Vecchio hiding on the roof. His first words on being captured were, "I didn't kill nobody."

In 1979, the time of the Canzonieri murder trial, Louis Garippo had left his job with the State's Attorney and had become a judge with the Cook County Criminal Division. He was randomly selected to preside over Del Vecchio's trial for the murder of Tony Canzonieri. He neither recused himself from the case, nor informed Del Vecchio's attorneys about his involvement in the 1965 prosecution. Before the trial, Del Vecchio's attorneys made motions *in limine* to exclude evidence pertaining to the 1965 conviction and confession. They asserted three reasons to preclude the evidence: that the facts relating to the 1965 confession and conviction were irrelevant to the 1977 murder; that the 1965 confession had been involuntary and taken in violation of *Miranda*; and that the law in 1965 which allowed juveniles to be charged as adults was unconstitutional. Judge Garippo withheld ruling on these matters, but let the defense know that he would likely allow evidence about the 1965 case if the defense introduced evidence that Del Vecchio was insane at the time of the murder. Although the defense laid the groundwork to argue Del

Vecchio's insanity, they never presented the defense. So the state never attempted to introduce the evidence about the 1965 murder. Therefore, Judge Garippo never officially ruled during the guilt phase of the trial on the motions to preclude the evidence.

The evidence presented against Del Vecchio at the trial was overwhelming. Having abandoned the insanity defense, he really had no persuasive theory of defense. The jury convicted Del Vecchio for Tony's murder. The case then proceeded to the sentencing phase, which involved testimony and other evidence about whether Del Vecchio should be put to death. The state sought to introduce evidence concerning the 1965 murder. Again, Del Vecchio's attorneys challenged the evidence. Judge Garippo, believing that it was important for the jurors to consider Del Vecchio's violent history when they made their sentencing decision, ruled that the evidence was admissible. Pursuant to that ruling, the government introduced Del Vecchio's 1965 written confession, in which he discussed Mr. Christiansen's killing and related events in great detail. Del Vecchio had sought to preclude the 1965 confession on the basis that it was involuntary. Judge Garippo did not grant Del Vecchio an evidentiary hearing to address the voluntariness of the confession; he simply allowed the confession into evidence, leaving Del Vecchio the opportunity to claim to the jury that the confession was not voluntary. The government also presented evidence that Del Vecchio falsely claimed in 1965 that he killed because of drug use, and argued that Del Vecchio's tendency to blame his crimes on drugs was part of a recurring pattern. After hearing this and all of the other evidence, the jury found that there were sufficient aggravating circumstances to warrant the death penalty, and no mitigating circumstances to prevent it. *See* Ill.Rev.Stat.1975, ch. 38, par. 9–1(b). The court imposed the sentence of death.

That was fifteen years ago. Since then, Del Vecchio has been housed in Illinois prisons awaiting execution. His death penalty was stayed for a time as the Illinois Supreme Court considered his appeal; that court affirmed both Del Vecchio's conviction and death sentence. *People v. Del Vecchio*, 105 Ill.2d 414, 86 Ill.Dec. 461, 475 N.E.2d 840 (1985). The United States Supreme Court denied *certiorari*. 474 U.S. 883, 106 S.Ct. 204, 88 L.Ed.2d 173 (1985). Justices Marshall and Brennan dissented from that order. They took the position that Del Vecchio was entitled to an evidentiary hearing in the sentencing phase of the 1979 trial, to challenge the voluntariness of the 1965 confession. *Id.* In 1986, Del Vecchio discovered that Judge Garippo had been involved in his 1965 prosecution. Based on that and other legal theories, Del Vecchio petitioned for a new trial under the Illinois Post–Conviction Hearing Act, Ill.Rev.Stat.1985, ch. 38, paras. 122–1 *et seq.* The court dismissed that petition and the Illinois Supreme Court affirmed. 129 Ill.2d 265, 135 Ill.Dec. 816, 544 N.E.2d 312 (1989). Once again, the United States Supreme Court denied *certiorari*. 494 U.S. 1062, 110 S.Ct. 1540, 108 L.Ed.2d 779 (1990).

His direct appeals finally exhausted, Del Vecchio filed a petition for writ of habeas corpus in the district court. He made two primary arguments, along with a variety of others. First, he argued that he was denied a fair trial because Judge Garippo, who had been involved in prosecuting him for the 1965 murder, sat as presiding judge during the Canzonieri murder trial. Second, he argued that he was denied his constitutional right to an evidentiary hearing during the sentencing phase of the 1979 trial to test the voluntariness of the 1965 confession. Finally, Del Vecchio made several other claims: that the prosecutors misled the jury to believe that if he was not sentenced to death, he eventually would finesse state authorities into granting him parole; that the court should have ordered a hearing to determine whether one of the state's witnesses committed perjury; that the court erred by allowing alleged hearsay statements made by three experts concerning drug use; that the 1965 confession should have been excluded from the jury's consideration because it was taken in violation of *Miranda;* and that the death penalty jury instructions were confusing.

The district court agreed with Del Vecchio's second argument, determining that Del Vecchio was entitled to an evidentiary hear-

ing to challenge the voluntariness of the 1965 confession. The court remanded the case to state court, with instructions to conduct an evidentiary hearing, at which the state would have the burden to prove that the confession was voluntary. But the court otherwise denied the petition. 795 F.Supp. 1406. Del Vecchio appealed the district court's order to the extent that it denied the petition. Illinois cross-appealed the district court's decision to remand to the state court to conduct an evidentiary hearing on the voluntariness of the 1965 confession.

A divided panel of this court agreed with the district court's conclusion that Del Vecchio was entitled to an evidentiary hearing to test the voluntariness of his confession, but reversed the district court's decision that the proceedings were otherwise constitutional. 8 F.3d 509. The court held that Del Vecchio's trial and sentencing were constitutionally flawed because Judge Garippo's previous involvement with the 1965 prosecution necessarily rendered him biased in the Canzonieri trial. The full court vacated that opinion, and decided to rehear the case en banc. 8 F.3d 530. On rehearing, we first consider the legal questions addressed in the vacated opinion: 1) whether Del Vecchio was denied a fair trial because Judge Garippo presided as judge; and 2) whether Del Vecchio was entitled to an evidentiary hearing to test the voluntariness of his 1965 confession. We also address the other previously mentioned issues Del Vecchio raised on appeal, which were not addressed in the vacated opinion.

## II. Analysis

■ A prisoner is entitled to a writ of habeas corpus if he is being held under a state court judgment obtained in violation of the Constitution. 28 U.S.C. § 2254; *Williams v. Chrans,* 945 F.2d 926, 931 (7th Cir.1991). Our habeas corpus jurisdiction, therefore, "is limited to questions of federal and constitutional custody. In other words, 'federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.'" *Haas v. Abrahamson,* 910 F.2d 384, 389 (7th Cir.1990), quoting *Lee v. Flannigan,* 884 F.2d 945, 952 (7th Cir.1989). In this case, the district court

considered all of the alleged constitutional violations Del Vecchio raised in his petition, and determined that he was entitled to relief only on his claim that he had the right to an evidentiary hearing to address the voluntariness of his confession. We review *de novo* the district court's legal conclusions. *Drake v. Clark,* 14 F.3d 351, 355 (7th Cir.1994).

### A. Appearance of Bias

Del Vecchio first argues that he was denied a fair trial because Judge Garippo's participation in the 1979 trial created an appearance of bias. Under his theory, a showing of actual bias or prejudice would be unnecessary. He would only have to show that Judge Garippo had some temptation to be biased in order to demonstrate an appearance of bias. He finds this temptation in the intersection between the 1965 trial, in which Garippo supervised the prosecution, and the 1979 trial, where Garippo acted as judge. Del Vecchio claims that the confluence of those events raised a number of temptations for Judge Garippo, including the temptation to favor· the state in motions to introduce evidence concerning the 1965 proceedings, and the temptation to sabotage the capital sentencing hearing because of some personal responsibility Judge Garippo felt for Del Vecchio's light sentence for the 1965 murder.

As we will discuss later, it stretches the facts to suppose that Judge Garippo had any sort of temptation to be biased in 1979. Really, he was only tangentially involved in Del Vecchio's 1965 prosecution. His decisions regarding the prosecution had little if anything to do with Del Vecchio being a free man in 1977, when he killed Tony Canzonieri. Judge Garippo had no real personal stake in the outcome of the motions to suppress evidence which were filed in the 1979 trial. Certainly, he had less personal stake than a judge who presides over a case against a person he had sentenced in an earlier case— a common occurrence in our judicial system which does not prompt due process concerns. *See Liteky v. United States,* —— U.S. ——, ——, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994) ("[a]lso not subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what

they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials regarding the same defendant."). But this is a death penalty case, and our court is closely divided. Thus we will examine Del Vecchio's seemingly remote claim that Garippo's participation in the 1965 prosecution tempted him to undermine the 1979 case. Therefore, we first address when the possibility of temptation alone—without a showing of actual influence or bias—is enough to demonstrate a due process violation.

 Certainly, the appearance of justice is important in our system and the due process clause sometimes requires a judge to recuse himself without a showing of actual bias, where a sufficient motive to be biased exists. A long line of Supreme Court cases compel these general conclusions. In *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927), the Court stated that "[e]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." Where such temptations exist, the due process clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.... [T]o perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986).

Despite the Supreme Court's broad pronouncements about "the appearance of justice," we cannot answer the due process question simply by concluding that it may have looked bad for Judge Garippo to preside at trial. If the question truly is whether a defendant received a fair trial, bad appearances alone should not require disqualifica-

tion to prevent an unfair trial. What may appear bad to an observer, especially in hindsight, may not have influenced—or, more importantly, may not have had any real possibility to influence—the judge in his decision-making process. Consider the following hypothetical. Suppose a judge does not know a close relative has a financial interest in a case he tries. To the outside observer aware of the interest but unaware of the judge's lack of knowledge, it would look bad for the judge to try that case. But if the judge does not even know about the relative's financial interest, how could he be tempted to undermine the case? And if no actual incentive exists for the judge to be biased—if the judge does not have reason to be partial—how could the judge's presiding over the trial deprive a party of his right to a fair trial before an impartial judge? *See Bradshaw v. McCotter*, 796 F.2d 100, 101–03 (5th Cir.1986) (Gee, J., concurring.).[1]

 The dissents treat the Supreme Court's "appearance of justice" language from *Murchison* and *Aetna* as holding that the due process clause requires judges to recuse themselves based solely on appearances. But those cases present no such holding; the Supreme Court's mention of "appearance of justice" certainly does not compel reversal on due process grounds if a federal judge decides—based on a personal view of judicial protocol—that it looked bad for a state judge to try a case. Such a pure appearance approach would be hard to reconcile with the bevy of Supreme Court precedents on the issue of recusal which do not address the "appearance of justice." *See, e.g., Liteky*, —— U.S. at ——, 114 S.Ct. at 1147. Appearances are usually for the eyes of the beholder. Years after whatever appearance there was has disappeared, a reviewing judge is left not with appearance but with hindsight speculation. That will not suffice as a basis for overturning a conviction. The Supreme Court has never rested the vaunted principle of due process on

---

1. This hypothetical is not meant to suggest that "Judge Garippo might not even have remembered his role in the Christiansen case by the time Del Vecchio appeared at the Canzonieri trial." Cummings, J. dissent at 1392. This hypothetical makes no reference to Judge Garippo, and is meant to illustrate the fallacy of viewing only appearances when facing a due process question.

something as subjective and transitory as appearance.[2] Instead, the Supreme Court simply uses the "appearance of justice" language to make the point that judges sometimes must recuse themselves when they face possible temptations to be biased, even when they exhibit no actual bias against a party or a cause.

In short, bad appearances alone do not require disqualification. Reality controls over uninformed perception. Del Vecchio cites no case in which the Supreme Court has overturned a verdict on due process grounds based on a mere appearance of bias. Our court was correct in holding that "a litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality." *Margoles v. Johns,* 660 F.2d 291, 296 (7th Cir.1981). When the Supreme Court talks about the "appearance of justice," it is not saying that bad appearances alone require disqualification; rather, it is saying that when a judge is faced with circumstances that present "some [actual] incentive to find one way or the other" or "a real possibility of bias," a court need not examine whether the judge actually was biased. *Id.* at 297 (quoting *Howell v. Jones,* 516 F.2d 53, 57–58 (5th Cir.1975)); *Bradshaw,* 796 F.2d at 102 (Gee, J., concurring). Absent the incentive for bias, however, disqualification is not required despite bad appearance.

■ Moreover, even if Judge Garippo faced some "possible temptation" to be biased against Del Vecchio, not every "possible temptation" to be biased presents a sufficient possibility of bias to require disqualification. This is evident from other language in the same cases in which the Court talks about "possible temptations." Thus, in *Aetna* and *Tumey,* the Court noted that " '[n]ot all questions of judicial qualification ... involve constitutional validity.... [M]atters of kinship, personal bias, state policy, remoteness of interest, would generally be matters of legislative discretion' "—even though any of these

matters, particularly kinship and personal bias, could offer a "possible temptation" to be biased. *Aetna,* 475 U.S. at 820, 106 S.Ct. at 1584; *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441. At some point, a " 'biasing influence ... will be too remote and insubstantial to violate the constitutional constraints.' " *Aetna,* 475 U.S. at 826, 106 S.Ct. at 1588 (quoting *Marshall v. Jerrico,* 446 U.S. 238, 243, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980)).

This merely recognizes, at least implicitly, that in the real world, "possible temptations" to be biased abound. Judges are human; like all humans, their outlooks are shaped by their lives' experiences. It would be unrealistic to suppose that judges do not bring to the bench those experiences and the attendant biases they may create. A person could find something in the background of most judges which in many cases would lead that person to conclude that the judge has a "possible temptation" to be biased. But not all temptations are created equal. We expect—even demand—that judges rise above these potential biasing influences, and in most cases we presume judges do. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (the contention that the combination of investigative and adjudicatory functions necessarily disqualifies an administrative adjudicator "must overcome a presumption of honesty and integrity in those serving as adjudicators.").

The common law recognized this reality. At the time the American court system was established, the common law of disqualification "was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else." John P. Frank, *Disqualification of Judges,* 56 Yale L.J. 605, 609 (1947). No other interest would suffice to require, or even permit, a judge to disqualify himself, including evidence of bias against a litigant. *Id.* at 611–12; *see also Aetna,* 475 U.S. at 820, 106 S.Ct. at 1584. As Blackstone put it, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon

---

**2.** Judge Easterbrook has filed a concurring opinion in which he agrees with the conclusion that appearances alone do not require disqualification. He provides a detailed historical analysis to bolster this conclusion. We agree with this historical analysis, and cite it to support the position that the Supreme Court has never rested due process on appearance.

that presumption and idea." 3 W. Blackstone, Commentaries *361 (quoted in *Aetna*, 475 U.S. at 820, 106 S.Ct. at 1584).

As the common law recognized, and as experience teaches, the lure of lucre is a particularly strong motivation, and therefore judges ought to be prohibited from presiding over cases in whose outcomes they have a direct financial interest. Of course, the Supreme Court has held the due process clause requires disqualification for interests besides pecuniary interests. But the constitutional standard the Supreme Court has applied in determining when disqualification is necessary recognizes the same reality the common law recognized: judges are subject to a myriad of biasing influences; judges for the most part are presumptively capable of overcoming those influences and rendering evenhanded justice; and only a strong, direct interest in the outcome of a case is sufficient to overcome that presumption of evenhandedness.

The Supreme Court's disqualification cases illustrate this point. The cases requiring disqualification all involved "direct, personal [and] substantial" influences on the judges involved. *Aetna*, 475 U.S. at 822, 106 S.Ct. at 1585. In each of these cases, it is fair to say that the influences involved struck at the heart of human motivation, that an average man would find it difficult, if not impossible, to set the influence aside.

In both *Tumey* and *Aetna*, for example, judges were faced with "direct, personal, substantial, pecuniary interest[s]." *See Aetna*, 475 U.S. at 824, 106 S.Ct. at 1586. In *Tumey*, the judge in a criminal case was paid only if the defendant was convicted. 273 U.S. at 520, 47 S.Ct. at 440. In *Aetna*, Justice Embry of the Alabama Supreme Court cast the deciding vote and wrote the majority opinion in a case establishing a legal proposition that "had the clear and immediate effect of enhancing both the legal status and settlement value" of two pending cases Justice Embry had filed as a plaintiff. 475 U.S. at 822–24, 106 S.Ct. at 1585–86.

The judge in *Ward v. City of Monroeville, Ohio,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), faced a temptation similar to those faced by the judges in *Tumey* and

*Aetna.* In *Ward,* the Court held that the mayor of Monroeville could not sit as a judge in traffic court. The mayor was responsible for the town's finances and revenue production; Monroeville derived a "major part" of its income from fines and other costs imposed in that court. The Court sensibly held that the mayor's responsibility for town finances "may make him partisan to maintain the high level of contribution from the mayor's court." *Id.* at 60, 93 S.Ct. at 83. That interest, like the judge's personal financial interest in *Tumey,* provided the mayor sufficient incentive to find against the defendant that the mayor could not, consistently with the due process clause, sit as judge. *See id.*

The Court has also required disqualification in the face of a litigant's direct personal insults to a judge. In *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), the defendant during the course of his trial called the judge, among other epithets, a "dirty [S.O.B.]," a "dirty tyrannical old dog," a "stumbling dog," and a "fool," had charged the judge with running a "Spanish Inquisition," and had told the judge to "Go to hell." *Id.* at 466, 91 S.Ct. at 505. The Court held that the judge could not subsequently try the litigant for contempt in the face of this abuse. The litigant's insults were "apt to strike 'at the most vulnerable and human qualities of a judge's temperament.' " *Id.* (quoting *Bloom v. Illinois,* 391 U.S. 194, 204, 88 S.Ct. 1477, 1483, 20 L.Ed.2d 522 (1968)). *See also Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (judge who had become embroiled in a "running controversy" with an attorney that resulted in "marked personal feelings ... on both sides," and during which the judge had displayed an "unfavorable personal attitude" toward the attorney, could not try the attorney for contempt).

In *Murchison,* the Court held that the judge's combination of prosecutorial and adjudicatory functions in the same case violated due process. In that case, a state court judge acted as a "one-man grand jury" investigating police corruption. Two witnesses before the judge in his role as grand juror answered questions in such a way as to convince the judge that those witnesses had

committed contempt. The judge charged the two witnesses with contempt and subsequently tried and convicted them. 349 U.S. at 134–35, 75 S.Ct. at 624. The Supreme Court held that the trial before the same judge who brought the contempt charges violated the defendants' right to due process. "Having been part of [the accusatory process] a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.* at 137, 75 S.Ct. at 626.

A comparison of the situations in which the Court required disqualification with situations in which the Court did not find disqualification was required makes it clear that not all "possible temptations" toward bias require a judge to disqualify himself. For example, in *Aetna,* the Court held that Justice Embry's general antipathy toward and frustration with insurance companies did not require him to disqualify himself. 475 U.S. at 820–21, 106 S.Ct. at 1585. "[O]nly in the most extreme of cases" would the Constitution require disqualification for this type of general bias. *Id.* at 821, 106 S.Ct. at 1585.

█ Likewise, not all contemptuous conduct by a person prevents a judge from trying the person for contempt. The Court refused to hold a judge disqualified from trying a witness for contempt in *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), despite the witness' continued criticism of the judge, disobedience to his orders during trial, and "disruptive, recalcitrant and disagreeable commentary." *Id.* at 584, 84 S.Ct. at 847. One might suppose this disobedience and criticism offered a "possible temptation" to be biased against the defendant. But the judge had not become "personally embroiled" with the litigant, and the Court refused to "assume that judges are so irascible that they cannot fairly deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Id.*

The line between interests that require disqualification and those that do not is not always clear. Consider the contrast between *Murchison* and *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), a case involving similar circumstances. In *Withrow,* the Wisconsin Medical Examining Board commenced an investigation to determine whether a doctor had committed certain illegal acts. The Board subsequently decided to hold a hearing to determine whether the doctor had committed the alleged illegal acts and whether to suspend the doctor's license temporarily. 421 U.S. at 39–41, 95 S.Ct. at 1460–61. The Supreme Court held that the Board could adjudicate the same charges it had investigated and decided to prosecute without violating the doctor's due process rights. *See id.* at 47–55, 95 S.Ct. at 1464–68.

One may wonder why the Court found a due process violation in *Murchison* but not *Withrow.* In both cases, the same person (or body) had served as both prosecutor and adjudicator. In both cases, the adjudicators seemed to have had a "possible temptation ... not to hold the balance nice, clear, and true...." But the Court distinguished *Withrow* from *Murchison;* the procedure in *Murchison* violated due process "not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on 'his own personal knowledge and impression of what had occurred in the grand jury room' an impression that 'could not be tested by adequate cross-examination.'" 421 U.S. at 53, 95 S.Ct. at 1467 (quoting *Murchison,* 349 U.S. at 138, 75 S.Ct. at 626).

█ Not even all financial interests are disqualifying. In *Aetna,* for instance, six other judges were members of the plaintiff class in the two suits Justice Embry had filed. Although those six justices conceivably had a "slight pecuniary interest" in the outcome—and, therefore, a "possible temptation" to be biased—the Court held that their disqualification was not required. 475 U.S. at 825–26, 106 S.Ct. at 1587–88. The justices' interests, though pecuniary, were not "direct, personal, and substantial...." *Id.* Any gain to these justices from a favorable decision in *Aetna* was "speculative and contingent;" the class had not yet been certified, and no class relief had been awarded. *Id.*

■ Therefore, the Court's cases require that we go beyond generalizations about "possible temptations" in deciding whether Judge Garippo was required to disqualify himself. The question is not whether some possible temptation to be biased exists; instead, the question is, when does a biasing influence require disqualification? Consistent with the common law, we begin in answering this question by presuming "the honesty and integrity of those serving as adjudicators." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464; *Dyas v. Lockhart,* 705 F.2d 993, 997 (8th Cir.1983). Disqualification is required only when the biasing influence is strong enough to overcome that presumption, that is, when the influence is so strong that we may presume actual bias. *See Dyas,* 705 F.2d at 996–97. This occurs in "situations ... in which experience teaches that the possibility of actual bias is too high to be constitutionally tolerable." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. A court must be convinced that a particular influence, "under a realistic appraisal of psychological tendencies and human weakness," poses "such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.*

■ Judged by this standard, Judge Garippo was not required to disqualify himself. Judge Garippo faced none of the biasing influences involved in the cases in which the Supreme Court required disqualification. Judge Garippo had no financial interest—direct or indirect—in the outcome of Del Vecchio's trial. He had never been subject to any personally insulting, abusive, or even disrespectful remarks by Del Vecchio or his attorneys. He did not serve the dual role of prosecutor and judge in the Canzonieri trial.

Judge Garippo had been involved in some aspects of Del Vecchio's prosecution for murder in 1965—fourteen years before the Canzonieri trial. But as both the Fifth and Sixth Circuits have held, no per se rule disqualifies a judge because he has prosecuted a defendant in the past. *Corbett v. Bordenkircher,* 615 F.2d 722, 723–24 (6th Cir.1980); *Murphy v. Beto,* 416 F.2d 98, 100 (5th Cir.1969). This rule is consistent with the Supreme Court's

cases. Prosecuting a defendant in one case is not the kind of action from which we can presume bias or prejudgment in a future case.

So, what personal motive could Judge Garippo possibly have had to undermine the 1979 trial? Del Vecchio identifies two theories. First, he contends that prosecutor Garippo was closely involved in gathering evidence concerning the 1965 murder. He argues, therefore, that Judge Garippo had a personal stake in affirming the validity of that evidence. It follows, from Del Vecchio's viewpoint, that in 1979 Judge Garippo could not fairly comply with the applicable rules of evidence when ruling on the admissibility of the 1965 evidence. Instead, he disregarded the rules and simply admitted the evidence. Second, Del Vecchio contends that prosecutor Garippo's decision in 1965 to expedite the indictment resulted in Del Vecchio being initially sentenced as a juvenile. The theory is that prosecutor Garippo cut Del Vecchio a break in 1965, leading to his early release from prison, which allowed him to kill Tony in 1977. Under this theory, Judge Garippo felt personal responsibility for Tony's murder, and could not fairly conduct the 1979 trial. We shall consider each theory in turn.

■ Del Vecchio did file motions to exclude use of his 1965 confession and conviction in the Canzonieri trial, and Judge Garippo did have to rule on these motions, at least in the trial's sentencing phase. But as the Court in *Murchison* stated, the interest necessary to disqualify a judge "cannot be defined with precision. Circumstances and relationships must be considered". 349 U.S. at 136, 75 S.Ct. at 625. The circumstances in this case—the actual contents of the motions and the issues they raised—do not warrant a finding that Judge Garippo was so likely to have prejudged the motions' merits that we can presume he could not impartially decide the motions.

In the first motion, Del Vecchio challenged the use of evidence about the 1965 conviction, claiming that the conviction was irrelevant to the issues at the 1979 trial. In the second motion, Del Vecchio alleged that his 1965 conviction was illegal because the statute that allowed juveniles to be charged as adults

violated due process in two ways: the statute did not require a hearing to determine if a juvenile should be charged as an adult; and the statute left the decision to charge a juvenile as an adult to the "absolute and totally standardless discretion" of the State's Attorney and circuit court judge. Finally, in the third motion, Del Vecchio challenged the use of his 1965 confession in the 1979 trial, claiming that the confession was involuntary and obtained in violation of *Miranda.* Judge Garippo never ruled on these motions during the guilt phase of the trial. He did not have to; the prosecution never attempted to introduce the evidence. But he did allow evidence from the 1965 proceedings at the sentencing phase. Is it possible to presume, or even to infer, that he did so because he had a personal stake in the outcome? To answer this, we must examine Judge Garippo's personal stake in each motion.

First, Del Vecchio sought to preclude evidence about the 1965 conviction, contending that it was irrelevant to the 1979 proceedings. Judge Garippo allowed the evidence at the sentencing phase, determining it to be relevant for the jury to consider when deliberating the fate of the twice-convicted killer. Del Vecchio asks us to infer that Judge Garippo's decision on that motion was not a careful appraisal on the issue of relevance; rather, that it was an unscrupulous effort to impose the death sentence. But that is not a reasonable, much less permissible inference. There is no cause to think—let alone presume—that Judge Garippo could not impartially consider the relevance of the 1965 conviction. The question of relevance in no way required Judge Garippo to judge any decision he had made in 1965. It was not Judge Garippo who killed Mr. Christiansen, confessed to the murder and pleaded guilty. The 1965 conviction existed independently of anything prosecutor Garippo is alleged to have done. Judge Garippo simply had no personal stake in determining the 1965 conviction to be relevant.

In the second motion, Del Vecchio sought to preclude evidence of the 1965 conviction because it was obtained under a law allowing juveniles to be charged as adults, which he contended was unconstitutional. Judge Gar-

ippo permitted this evidence, determining that the law was constitutional. It is true that Judge Garippo participated in the decision to charge Del Vecchio as an adult (a decision that Judge Garippo in his 1989 deposition described as a "no-brainer"—16-year-olds accused of murder were almost always charged as adults). But Del Vecchio's motion did not focus on Judge Garippo's decision; it focused on the statute under which he made that decision. The motion did not allege that Judge Garippo himself violated the Constitution except to the extent that he followed the allegedly unconstitutional statute. There is no reason to presume that a judge in Judge Garippo's position could not impartially decide Del Vecchio's motion, unless perhaps he had some professional or intellectual stake in the statute's constitutionality. But the record reveals no such stake. There is no indication, for example, that Judge Garippo had anything to do with drafting or passing the statute, or that he had ever defended the statute's constitutionality. The motion in no way required Judge Garippo to judge his own decision as a prosecutor.

In the third and final motion, Del Vecchio attempted to preclude his 1965 confession, contending that it was involuntary. But Judge Garippo allowed the jury to review the confession during the sentencing phase. Again, there is no possible inference that Judge Garippo had a personal stake in the confession. As a prosecutor, Garippo was at best only tangentially involved in the circumstances surrounding Del Vecchio's confession. Del Vecchio gave two confessions, one to police and one to Assistant State's Attorney Patrick Tuite, prosecutor Garippo's subordinate. Prosecutor Garippo read Tuite's report about the confession. But Garippo himself took no confession from Del Vecchio. In fact, Judge Garippo's deposition indicates that he first read about the crime in the newspaper and did not even know of the case when the police and Tuite took Del Vecchio's confessions. The motion does not allege, nor does the record indicate, that prosecutor Garippo improperly trained his subordinates, or that he required or allowed subordinates to extract involuntary confessions from suspects, either systematically or in this case. Again, any personal stake Judge Garippo

would have had in upholding the confession was minimal. There is no reason to presume that Judge Garippo could not impartially evaluate the work of the police or his former subordinate.

Our decision in *Barry v. United States*, 528 F.2d 1094 (7th Cir.1976), is instructive on whether Del Vecchio's pretrial motions required Judge Garippo to disqualify himself. In *Barry*, the defendant was indicted under a then-novel (but subsequently upheld) construction of the Hobbs Act. Barry's trial judge had been a United States Attorney. As United States Attorney, he had personally decided to use the Hobbs Act to prosecute activity such as that in which Barry was involved. *Id.* at 1097. One of the questions the judge had to decide at trial was whether the Hobbs Act applied to Barry's activities. *Id.* at 1100.

The judge in *Barry* had at least as much professional and intellectual stake in the outcome of the Hobbs Act question as Judge Garippo had in the outcomes of Del Vecchio's motions to exclude his 1965 conviction and confession. He had made the decision to apply the Hobbs Act the way it was applied in Barry's case. But after examining Supreme Court precedent and the practices of Supreme Court justices in deciding whether to disqualify themselves, this court held that the judge's interest was insufficient to require disqualification under the due process clause. *See id.* at 1099–1100 & 1100 n. 19.[3]

■ The second theory Del Vecchio presents in arguing that Judge Garippo was personally motivated to undermine the 1979 trial centers on prosecutor Garippo's 1965 decision to expedite the indictment. Del Vecchio contends that this decision began a chain reaction which eventually led to his early release from prison, allowing him to kill again. Under Del Vecchio's theory, Judge Garippo felt personal responsibility for the 1977 murder, and could not have been unbiased during the trial because he held a grudge against Del Vecchio. In order to accept this theory, we must first conclude that the record allows the inference on which it is based: that prosecutor Garippo cut Del Vecchio a break in 1965 which led to his being free to kill again in 1977.

But the record does not permit this inference. All prosecutor Garippo did, really, was agree to expedite the indictment. As it turned out, this only postponed the date of Del Vecchio's sentencing as an adult; where-

---

**3.** As *Barry* indicates, the disqualification practice of Supreme Court justices is also instructive. Justice Black, *Murchison's* author, was one of the principal authors of the Fair Labor Standards Act and helped shepherd the Act through Congress. Yet, Justice Black sat in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the case deciding the Act's constitutionality. Justice Black's is not an isolated case. For example, Justice Frankfurter, as a law professor, had written extensively in the field of labor law and had co-authored a book, *The Labor Injunction*, that had severely criticized the use of injunctions against labor unions. Justice Frankfurter had also played an important part in drafting the Norris–LaGuardia Act, an act designed to correct what was considered the abusive use of injunctions by federal courts in labor disputes. Yet, Justice Frankfurter not only sat in, but wrote the opinion in *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), a leading case interpreting the Act's scope. *See Laird v. Tatum*, 409 U.S. 824, 831–32, 93 S.Ct. 7, 12, 34 L.Ed.2d 50 (1972) (memorandum of Justice Rehnquist). Justice Jackson participated in *McGrath v. Kristensen*, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950), a case raising the same issue he had decided as Attorney General. *Laird,* 409 U.S. at 833, 93 S.Ct. at 12. And on the Supreme Court, Justice Holmes sat in several

cases reviewing decisions by the Supreme Judicial Court of Massachusetts in which he had participated. *See Laird*, 409 U.S. at 836, 93 S.Ct. at 14 (citing cases).

While the practices of Supreme Court justices regarding disqualification may not be dispositive, they are persuasive. Certainly, it would be presumptuous for us to hold that some of the most distinguished jurists in our nation's history regularly violated the Constitution by sitting in cases in which we might conclude that disqualification is prudent. Any interest Judge Garippo had in the outcome of Del Vecchio's motions seems to be no greater than—and probably less than—the interests of Justice Black in *Darby*, Justice Frankfurter in *Hutcheson*, Justice Jackson in *McGrath*, or Justice Holmes in any of the cases in which he sat on review from the Massachusetts Supreme Judicial Court. All these Justices had a real professional and intellectual stake in the decisions in those cases, a higher stake than Judge Garippo supposedly should have had in the outcome of Del Vecchio's motions. Yet they decided they could put that stake aside and rule fairly. There is no reason to presume that Judge Garippo was not likewise able to put aside the minimal interest he might have had in the decision of Del Vecchio's motions.

as he otherwise would have been sentenced as an adult immediately, instead he was sentenced as an adult a few years later when he turned twenty-one. There is no allegation or evidence that the judge who ultimately sentenced Del Vecchio as an adult had any less discretion than a judge in 1965 would have had. Indeed, Del Vecchio faced a minimum of fourteen years and a maximum of life in prison both in 1965, and in 1971, when he was finally sentenced as an adult. It just so happened that the judge in 1971 decided to be lenient. In retrospect, there is no telling whether a judge asked to sentence Del Vecchio as an adult in 1965 would have been lenient.[4] If we cannot know in retrospect, prosecutor Garippo could not have predicted as much when he made the decision to expedite the indictment. Once he did that, the punishment was out of his hands and it was left to the wisdom of the judges to sentence Del Vecchio. Granted, Del Vecchio ultimately received a light sentence for murdering Mr. Christiansen in 1965, but this light treatment was not because of prosecutor Garippo. It was because of the judge who sentenced Del Vecchio.

The only break Del Vecchio received because of the quick indictment was that he was allowed to spend the first four years of his sentence in a youth correctional facility, rather than in an adult prison. This break had no foreseeable connection to the 1977 murder. Therefore, any possible biasing influence stemming from the decision to expedite the indictment is far too remote to have required Judge Garippo's disqualification. Even if one perceived some obscure causal link between the expedited indictment and

the light sentence, it is highly unlikely that Judge Garippo would have felt sufficiently guilty about a decision with which he had so little to do that he could not have put this guilt aside at Del Vecchio's trial. The due process standard for disqualification requires an influence or interest that we can conclusively presume would cause the average judge to be biased. All prosecutor Garippo did was agree to expedite the indictment. By chance, this decision eventually placed Del Vecchio before a judge who decided to be lenient. Because prosecutor Garippo could not have foreseen such easy treatment, he was not likely to have felt responsible for it fourteen years later. It would be unreasonable to presume that Judge Garippo would have weighed the scales against Del Vecchio under these circumstances.

■ But even if prosecutor Garippo had undoubtedly given Del Vecchio a clear break—for example, if prosecutor Garippo had agreed to imposition of the minimum sentence in exchange for a guilty plea—the risk of bias would still be insufficient to hold that Judge Garippo was required to disqualify himself. Compare a prosecutor to a sentencing judge. In a system of indeterminate sentencing, such as the federal system before the Sentencing Guidelines, judges make thousands of decisions on sentence length, based in large part on the judges' personal evaluations of the defendants before them. Any one of those decisions could turn out to be wrong. But does a judge's incorrect decision to give a defendant a sentencing break in one case necessarily prevent the judge from presiding at that defendant's trial in a

---

4. In his dissent, Judge Cummings labels this assertion "sophistry," which we take to mean bad reasoning. Cummings, J. dissent at 56. But this reasoning emanates naturally from Illinois' sentencing laws; the laws in 1965 allowed a judge to be lenient. The point to be made, simply, is that there is no telling what a judge in 1965 would have done. The dissent asserts with certainty that a judge would have imposed a hefty sentence, because newspaper headlines at the time portrayed Del Vecchio as a drug-crazed killer. Curiously, the dissent also speculates that there was a "risk" that the Illinois Youth Commission would have released Del Vecchio "immediately," apparently disregarding these same startling headlines. Cummings, J. dissent at 1394–95.

The fact is, no judge on this court can accurately divine what could have happened in 1965 if Del Vecchio had been sentenced as an adult presumably after a high-profile trial and conviction. Nor could prosecutor Garippo have predicted the distant future when he agreed to expedite the indictment; of course the immediate achievement was a guilty plea and conviction. And because prosecutor Garippo could not have strung together the possibilities in order to predict Del Vecchio's second murder, it is not likely that he felt responsible for it; so responsible, in fact, that we should presume he would abandon his oath in order to assure Del Vecchio's death sentence.

case fourteen years later? Would the Circuit Court judge who actually gave Del Vecchio the minimum sentence have been required to disqualify himself from the 1979 trial? Can we presume that the average judge in this situation would violate his oath to be impartial? Most trial judges would rightly reject that suggestion; so does the Supreme Court. *See Liteky*, —— U.S. at ——, 114 S.Ct. at 1155. To suggest partiality in such situations is inconsistent with the "presumption of honesty and integrity of those serving as adjudicators." *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464.

This presumption should guide our decision; we should be careful before we engage in "unseemly excursions into [judges'] psyches." Cummings, J. dissent at 66. The Constitution empowers this court to intrude in the state process of convicting and sentencing only if we find a constitutional violation. We should not exaggerate propriety in order to find such a violation. Illinois' treatment of George Del Vecchio is anything but "tragic." *Cf.* Cummings, J. dissent at 1398. It exhibits a civilized attempt to deal with an unrepentant and twice-convicted murderer. Illinois caught, tried, convicted and heard all of the appeals of a murderer; it will now give that murderer a sentence the people of Illinois deem appropriate. As federal judges assigned to ensure due process under the Constitution, we must not create obstacles when the state of Illinois has fulfilled its constitutional obligations.

## B. Actual Bias

If Judge Garippo exhibited some actual bias in conducting the trial, Del Vecchio would have had a valid Fourteenth Amendment claim. "Fairness of course requires the absence of actual bias in the trial of a case." *Murchison*, 349 U.S. at 136, 75 S.Ct. at 625. But, as Del Vecchio concedes in his brief, "[i]n practice, actual bias is difficult if not impossible to prove." Probably because of this, Del Vecchio never really argues that Judge Garippo exhibited actual bias. He argues simply that "[d]ue process requires a judge to recuse himself in any situation in which there is a fair potential that an average person *might* be tempted to

tilt one way or the other; a showing of *actual* influence or bias is not required." Because of Del Vecchio's method of presentation, there is some question whether he waives the actual bias argument. He really confines his presentation to arguing that Judge Garippo had an appearance of bias. But because Del Vecchio seems to contend that Judge Garippo's supposed appearance of bias in some way portended his hidden actual bias, we shall consider whether the evidence in this case is sufficient to make a showing of actual bias.

The preceding section of this opinion—on the appearance of bias—resolves much of this question. Because none of the evidence discussed previously supports the inference that Judge Garippo had an actual substantial incentive to be biased, neither does it support the inference that he was actually biased. But Del Vecchio presents other circumstantial evidence adduced in the habeas corpus proceedings, which is meant to prove Judge Garippo's bias. We shall consider whether this evidence possibly supports the inference of actual bias.

Judge Garippo gave a deposition in these proceedings, in which he admitted that he personally feels betrayed by defendants who commit crimes after he has been lenient when sentencing them. Del Vecchio recounts this statement to argue that Judge Garippo felt similar antipathy towards him. But most sentencing judges probably feel this sense of betrayal; it is a natural emotion, though hardly a disqualifying interest. Taken to its logical conclusion, this "predisposition" theory would prevent a trial judge *from trying and sentencing* someone a second time—a common occurrence in our courts which, as the Supreme Court recently noted, does not raise concerns about bias. *See Liteky*, —— U.S. at ——, 114 S.Ct. at 1155. Judge Garippo's general antipathy toward defendants who abuse his lenience is akin to Justice Embry's general antipathy toward insurance companies that the Supreme Court found to be insufficient to disqualify the justice in *Aetna*.

Del Vecchio next points to two other pieces of circumstantial evidence he obtained in discovery for the purposes of this petition. He

notes that Judge Garippo's courtroom clerk had checked out the Christiansen case files before the Canzonieri trial started. The implication is that Judge Garippo took an unusual interest in Del Vecchio's case, and that this unusual interest points to bias. But this is like saying that an appellate judge who checks out a record before oral argument is taking an unusual interest in that case. In fact, the judge has a very good reason to examine the record—that reason is called preparation. Trial preparation does not start at the beginning of trial. In any event, this "evidence" shows not so much bias as inquisitiveness; and being inquisitive about an earlier case is not sufficient reason for us to presume—or even infer—bias on the part of the average judge (especially when such investigation is warranted by the demands of trial preparation).

Finally, Del Vecchio notes Judge Garippo's statement that "Del Vecchio was more deserving of the death penalty than John Wayne Gacy." Apparently, Judge Garippo made this off-the-record comment to Del Vecchio's attorney comparing three death penalty cases before him, including Del Vecchio's and Gacy's. Del Vecchio argues that this statement evidences Judge Garippo's bias against him. But according to Judge Garippo, the statement was directed not at which of the three defendants was most worthy of death, but rather at which defendant was a more likely "candidate" for the death sentence. Based on Judge Garippo's limited knowledge of the facts of the cases, he was speculating on which defendant was most vulnerable to a death sentence by a jury. Judge Garippo's explanation makes sense; if Judge Garippo was trying to railroad Del Vecchio, why would he tell Del Vecchio's lawyer? In any event, Del Vecchio has not presented any evidence inconsistent with Judge Garippo's testimony. In an affidavit, Del Vecchio's trial attorney stated only that Judge Garippo "indicated his ranking of the cases with respect to their relative merits as death cases.... Garippo indicated that of the three defendants, Del Vecchio in his view was the most appropriate candidate for imposition of the death penalty. He referred to Gacy as a 'distant third.' " The affidavit does not state that Judge Garippo said Del Vec-

chio was more "deserving" of the death penalty than Gacy. In context, then, Judge Garippo's statement about Gacy provides no evidence of any predisposition on Judge Garippo's part.

In sum, the record presents no facts indicating either actual bias, or a possible temptation so severe that we might presume an actual, substantial incentive to be biased. Therefore, Del Vecchio cannot prevail on his claim that he was denied due process because Judge Garippo presided at his trial.

### III.

The next constitutional issue Del Vecchio raises concerns the confessions he gave in 1965. He claims that the confessions were coerced, and he demands at least the opportunity to challenge the voluntariness of the confessions in an evidentiary hearing. The district court granted the writ of habeas corpus on this issue, remanding the cause to state court to conduct such a hearing. The district court determined that Del Vecchio was entitled to a hearing under the Supreme Court's decision in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Illinois filed its cross-appeal to challenge that ruling.

The Illinois Supreme Court addressed this issue in Del Vecchio's direct appeal. It determined that, under Illinois law, Del Vecchio's guilty plea in 1965 waived his challenge to the voluntariness of the confessions. *Del Vecchio,* 86 Ill.Dec. at 470, 475 N.E.2d at 849. A federal court is required to avoid collateral review of an issue in a habeas corpus case if the last state court which considered the issue resolved it on independent and adequate state law grounds. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Here, there is no question that the Illinois Supreme Court resolved the confession issue on independent state law grounds. The court determined that, as a matter of Illinois law, the guilty plea waived any subsequent challenge to the voluntariness of the confessions; this proposition finds a measure of support in Illinois law. *See, e.g., People v.*

*Brown,* 41 Ill.2d 503, 244 N.E.2d 159, 160 (1969) ("A constitutional right, like any other right of an accused, may be waived, and a voluntary plea of guilty waives all errors or irregularities that are not jurisdictional."). *See also People v. Phelps,* 51 Ill.2d 35, 280 N.E.2d 203, 204 (1972); *People v. Stanley,* 50 Ill.2d 320, 278 N.E.2d 792, 794 (1972); *People v. Jackson,* 47 Ill.2d 344, 265 N.E.2d 622, 624–25 (1970); *People v. Stice,* 160 Ill.App.3d 132, 112 Ill.Dec. 49, 53, 513 N.E.2d 463, 467 (1987); *People v. Owens,* 131 Ill.App.3d 381, 86 Ill.Dec. 435, 436, 475 N.E.2d 649, 650 (1985); *People v. Patterson,* 3 Ill.App.3d 824, 279 N.E.2d 169, 170 (1972); *People v. Goodwin,* 5 Ill.App.3d 1091, 284 N.E.2d 430, 431 (1972). *See also Healey v. Cannon,* 553 F.2d 1052, 1057–58 (7th Cir.1977).

But there is a question whether this independent state law ground was adequate. "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review ... of a federal constitutional claim." *Ford v. Georgia,* 498 U.S. 411, 423, 424, 111 S.Ct. 850, 857, 857, 112 L.Ed.2d 935 (1991), quoting *James v. Kentucky,* 466 U.S. 341, 348–51, 104 S.Ct. 1830, 1835–36, 80 L.Ed.2d 346 (1984). All Illinois Supreme Court cases before Del Vecchio's on this subject involved constitutional challenges made in the same case where the defendant made his guilty plea. The Illinois Supreme Court never before specifically faced the question whether a guilty plea cuts off *all* challenges to matters preceding the plea—even challenges made in a different case. Because it never faced the question, the Illinois Supreme Court's resolution in Del Vecchio's case was novel. *See NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 457–58, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958). ("Novelty in procedural requirements cannot be permitted to thwart review in this court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.").

Not only that, the Illinois Supreme Court's decision in Del Vecchio's case departs somewhat from the appellate court's decision in *People v. McLain,* 32 Ill.App.3d 998, 337 N.E.2d 82 (4th Dist.1975). *McLain* involved the same sequence as Del Vecchio's: confession, guilty plea, and a second prosecution at which the prosecutor introduced the confession. The appellate court held that the defendant was entitled to a hearing on the voluntariness of the confession, despite the earlier guilty plea. *Id.* 337 N.E.2d at 84. Given the apparent flux in Illinois law, coupled with the novelty of the Illinois Supreme Court's decision, we cannot say that the state applied a "firmly established and regularly followed" rule in Del Vecchio's case. Therefore, we will not apply a procedural bar to avoid review of the Illinois Supreme Court's decision. We proceed to the merits of the involuntary confession issue.

■ A criminal defendant has the "right to be free of a conviction based upon a coerced confession" guaranteed by the Due Process Clause of the Fourteenth Amendment. *Jackson,* 378 U.S. at 377, 84 S.Ct. at 1781. It protects both the accused and the criminal justice system to discard any confession that has the taint of coercion. Therefore, the Supreme Court allows the criminal defendant facing prosecution for an offense to which he confessed, to challenge the voluntariness of the confession at an evidentiary hearing. *Jackson,* 378 U.S. at 392–93, 84 S.Ct. at 1789. This extra procedural safeguard is meant to assure the reliability of the confession, which is always a highly persuasive piece of evidence in the prosecutor's arsenal.

■ The question here is whether *Jackson* required the Illinois trial court to interrupt the 1979 sentencing proceedings, in order to provide Del Vecchio with an evidentiary hearing to address the voluntariness of the 1965 confessions. Del Vecchio argues that *Jackson* established the right to such an evidentiary hearing wherever and whenever he chose to fight, even if it was at the sentencing phase of another trial for a different murder taking place fourteen years after the confessions. We do not read *Jackson* as broadly. *Jackson* established the principle that a person should be able to recount the circumstances of his confession to a court, so that an improperly obtained confession will not be used to gain a conviction for the crime described in the confession. In such circum-

stances, the confession is such a conclusive indication of guilt that the Supreme Court counsels an extra step in the process of determining admissibility—an evidentiary hearing—to assure that the confession is reliable.

In this case, Del Vecchio was not facing prosecution based on an allegedly coerced confession. By the time the 1965 confessions came into evidence during the sentencing phase of the 1979 trial, Illinois had long since determined that Del Vecchio was guilty for Mr. Christiansen's murder; he had pleaded guilty, served his time, and never disputed his guilt for that murder in a collateral proceeding or at the Canzonieri trial (he does not even dispute his guilt for the 1965 murder in this case). The confessions were not offered to prove Del Vecchio's guilt for the 1965 murder. Rather, the confessions were offered during a capital sentencing hearing for a different murder to prove an aggravating circumstance—that Del Vecchio had once before in his life killed in a random and violent fashion. There was not the danger, which *Jackson* addressed, that the confession might be used to gain a conviction for the crime described in the confession. Therefore, Del Vecchio did not have a constitutional right under *Jackson* to an evidentiary hearing to challenge his 1965 confessions.

Del Vecchio cites *Haring v. Prosise*, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983), to make the argument that his right to an evidentiary hearing extended into the 1979 sentencing proceedings. But *Haring* does not extend the right to challenge the confessions in the way Del Vecchio contends. In *Haring*, the Supreme Court held that a guilty plea does not bar a convicted defendant from filing a § 1983 action to challenge the constitutionality of an illegal search in the case in which he pleaded guilty. To reach this conclusion, the Court had to grapple with two issues. The first was whether 28 U.S.C. § 1738, which requires that federal courts give full faith and credit to state court judgments, barred the plaintiff's § 1983 action. This depended on whether the law of issue preclusion in Virginia—the state in whose courts the defendant pleaded guilty— barred the plaintiff's § 1983 action. 462 U.S.

at 313–17, 103 S.Ct. at 2373–75. The Court held that § 1738 did not bar the plaintiff's action because Virginia's law did not bar the action. *Id.* at 317, 103 S.Ct. at 2375. The second issue in *Haring* was whether the Court should "create a special rule of preclusion which nevertheless would bar litigation of his § 1983 claim." *Id.* The Court decided not to create such a special rule.

Unlike in *Haring,* the question is not whether Illinois law would bar Del Vecchio from challenging his confessions in his 1979 case because of his 1965 guilty plea and his failure to challenge those confessions in 1965. The Illinois Supreme Court has already held that Illinois law does bar such a challenge. Nor do we have to decide whether to create a federal rule of claim preclusion. Instead, the question before us is whether Illinois is constitutionally required to give Del Vecchio a second opportunity to challenge his confessions. *Haring* does not answer this question because *Haring* did not purport to create a constitutional rule prohibiting the type of bar Illinois applied. And, as we have already held, *Jackson* did not require an evidentiary hearing in these circumstances.

Practical considerations also warn against extending *Jackson ad infinitum,* to any subsequent proceedings where a defendant challenges the confession. This case perfectly exhibits those practical considerations. The district court, applying what it believed to be the holding of *Jackson,* ordered Illinois to conduct a hearing at which the state would have the burden to prove that the confessions were voluntary. This decision placed a tremendous onus on the state; in order to be able to introduce the crucial evidence of Del Vecchio's prior confessions against him at the sentencing hearing, the state would first have been required to demonstrate the reliability of the confessions based on what was, in fact, stale evidence. According to the district court, the Constitution required the state to reconstruct the circumstances of the confessions at the 1979 sentencing hearing, fourteen years after the confessions were taken. Because the state did not do that, the district court ordered it to hold the evidentiary hearing in 1992, twenty-seven years after the fact. We are now past twenty-nine years.

█ The Rules Governing Section 2254 Cases in the United States District Courts state a policy against the use of stale evidence to overturn state court judgments in habeas cases. Rule 9 addresses circumstances where a prisoner loses his right to challenge the constitutionality of legal proceedings because of a delayed petition. We make no determination whether the rule applies to this case; after all, there is some question whether Del Vecchio impermissibly delayed his challenge to the confessions, or whether the 1979 use of the confessions somehow resurrected that challenge. We cite the rule simply to demonstrate the policy against stale evidence in habeas corpus cases. The Advisory Committee Note for Rule 9 states in part:

> The petitioner.... may at some date, perhaps ten or fifteen years after the conviction, decide to challenge the state court judgment. The grounds most often troublesome to the courts are ineffective counsel, denial of right of appeal, plea of guilty unlawfully induced, use of a coerced confession, and illegally constituted jury. The latter four grounds are often interlocked with the allegation of ineffective counsel. When they are asserted after the passage of many years, both the attorney for the defendant and the state have difficulty in ascertaining what the facts are. It often develops that the defense attorney has little or no recollection as to what took place and that many of the participants in the trial are dead or their whereabouts unknown. The court reporter's notes may have been lost or destroyed, thus eliminating an exact record of what transpired. If the case was decided on a guilty plea, even if the record is intact, it may not satisfactorily reveal the extent of the defense attorney's efforts on behalf of the petitioner. As a consequence, there is obvious difficulty in investigating petitioner's allegations.
>
> The interests of both the petitioner and the government can best be served if claims are raised while the evidence is still fresh. The American Bar Association has recognized the interests of the state in protecting itself against stale claims by limiting the right to raise such claims after completion of service of a sentence imposed pursuant to a challenged judgment. *See* ABA standards relating to post-conviction remedies, section 2.4(c), p. 45 (approved draft, 1968). Subdivision (a) is not limited to those who have completed their sentence. Its reach is broader, extending to all instances where delay by the petitioner has prejudiced the state, subject to the qualifications and conditions contained in the subdivision.

The Advisory Committee Note proceeds to state that Rule 9 is based on the principle of laches, and defines laches as a "delay in one's rights as works a disadvantage to another." The Note goes on to declare "the presumption that the passage of more than five years from the time of the judgment of conviction to the time of filing a habeas petition is prejudicial to the state." Here, we are nearly thirty years after the fact; Del Vecchio's trial was fourteen years after the fact. The same policy considerations which underlie Rule 9 vitiate against requiring the state to prove the voluntariness of the 1965 confessions in this case. Illinois had conclusively determined Del Vecchio's guilt in 1965 and it had every right to rely on that determination—and the confessions supporting it—during the 1979 sentencing.

Del Vecchio, it is true, has a significant interest in seeing that an involuntary confession is not used against him. But Del Vecchio had that same interest in 1965 and had ample opportunity to challenge his confessions. In spite of his interest in attacking his confessions, Del Vecchio made a reasoned decision—a decision that worked to his immediate advantage—to plead guilty and forego challenging his confessions. And that is not all Del Vecchio did. Through his attorney, Del Vecchio stated that he had no objection to the state's introducing his confessions to establish the factual basis for his plea. Del Vecchio's attorney used portions of his confessions (specifically, the references to Del Vecchio's drug use on the night of the Christiansen murder) in arguing to the judge regarding Del Vecchio's possible sentence. Del Vecchio may now regret those decisions, but he does not allege that his attorney's performance in 1965 was deficient. Yet, Del Vecchio demands a hearing many years after

the fact to determine if his confessions were voluntary. But requiring Del Vecchio to live with the decisions he made in 1965 does not violate the Constitution. Nothing in the Constitution, or in any cases interpreting the Constitution cited by Del Vecchio, requires a state to accept a confession when it benefits the accused but (much) later defend that same confession when the accused concludes that the benefit is gone.

## IV.

### A. Other Arguments

1. Prosecutor's comment regarding experts.

 During the prosecutor's closing argument at the sentencing hearing, the following exchange took place:

Prosecutor: You have a right, ladies and gentlemen, to protect yourself from people like George Del Vecchio. You should demand that you be protected from people like George Del Vecchio. You must, you can't leave it up to the experts. You can't trust the experts. People like George Del Vecchio—

Defense Attorney: Objection.

The Court: He may argue.

Prosecutor: —can fool the experts. He's a manipulator, he's a malingerer, he fools other people, he uses other people. Don't put the decision on somebody else, because you can't count on them, because you can bet a few years from now there will be another expert who will be willing to come along and say he's fine.

Del Vecchio argues that these comments led the jury to believe that if they did not recommend the death sentence, there was a possibility that he would be paroled in a few years, free to kill again. He contends that because Illinois had eliminated parole at the time he was sentenced, see Ill.Rev.Stat. ch. 38, § 1003–3–3(d), the prosecutor's statements were inaccurate. He claims that the state's use of inaccurate information during the sentencing hearing violated his due process rights.

But Del Vecchio mischaracterizes the prosecutor's statements. The prosecutor never affirmatively stated that Del Vecchio might be paroled if he was not sentenced to death. The sum and substance of his statements was that Del Vecchio fooled "experts" to obtain an early release from prison after the 1965 murder; that Del Vecchio had shown an ability to fool experts; and that if not put to death, Del Vecchio would likely fool experts in the future, in a way that might affect his punishment. In order for these statements to be considered inaccurate, Del Vecchio would have to show that Illinois prisoners never have occasion to face experts, who have authority over the conditions of punishment. Del Vecchio argues only that Illinois removed the possibility of parole, but this does not satisfy his burden. Even without parole, from the time he entered prison to serve a life sentence, Del Vecchio would face a gauntlet of experts with responsibility over the seriousness of his punishment. From wardens to prison psychiatrists, Del Vecchio would have a lifetime to influence experts, and gain whatever advantages are available to prisoners in the Illinois penal system. Illinois argues that Del Vecchio would also periodically face the Prisoner Review Board. Ill.Rev.Stat. ch. 38, § 1003–6–3. He would also be eligible for executive clemency. In short, there was nothing inaccurate about informing the jury that if Del Vecchio was not put to death, he would face experts in the Illinois penal system who would have some say over the circumstances of his punishment.

 As the Supreme Court has stated, there is no constitutional violation when prosecutors tell capital sentencing juries of possible breaks the criminal might receive in his sentence, as long as the prosecutor "accurately characteriz[es the state's] sentencing choices." *California v. Ramos*, 463 U.S. 992, 1004 n. 19, 103 S.Ct. 3446, 3455 n. 19, 77 L.Ed.2d 1171 (1983). Del Vecchio has not shown that the prosecutor's statements were inaccurate. What's more, there is an irrefutable confirmation of accuracy in this case; the Illinois Supreme Court, on the two occasions it visited this question in Del Vecchio's case, determined that the prosecutor's statements accurately portrayed Illinois law. 86 Ill.Dec. at 471–72, 475 N.E.2d at 850–51; 135

Ill.Dec. at 825–26, 544 N.E.2d at 321–22. Once that court has spoken in such a specific way on a matter of Illinois law, we are hard pressed to rule differently. *See Estelle v. McGuire*, 502 U.S. 62, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("it is not the province of a federal habeas court to reexamine the state court determination on state law questions."); *Williams v. Chrans*, 945 F.2d 926, 956 (7th Cir.1991) ("If the state law, as construed by the state's tribunal, provided an unconstitutional result, then the writ should be granted, but not on the ground that the state doesn't know its own law."). Therefore, Del Vecchio was not denied his due process rights just because the jury heard the statements about experts; the highest court in the state has ruled—and we do not disagree—that the statements accurately characterized Illinois law.

■ Even if we were permitted to disregard the Illinois Supreme Court, and to accept Del Vecchio's argument that the statements were—under one possible interpretation—inaccurate, this would not be enough to overturn the death sentence. In order to overturn a death sentence on the basis that the jury heard inaccurate information, the inaccuracy must be one of "constitutional magnitude." *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 592, 30 L.Ed.2d 592 (1972). That means the circumstances must raise the possible inference that there was a "careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide...." *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *see also Zant v. Stephens*, 462 U.S. 862, 903, 103 S.Ct. 2733, 2756, 77 L.Ed.2d 235 (1983). Here, there is at best a question whether the prosecutor's references to "experts" were false; even if false, though, the vague and indirect statements certainly were not "extensively and materially false". And because the statements were vague and indirect, it is questionable whether the jury relied on them in its "pronouncement of sentence". Even if the statements were all Del Vecchio claims they were—false, material, prejudicial and pivotal—it would not be enough. Del Vecchio had the "opportunity to correct" any misperceptions the statements might have caused. But he failed to provide the jury with his view that, under Illinois law, there was no possibility he might be paroled. Instead, in his testimony at the sentencing hearing, he raised the possibility that he might be paroled: "my own part of me that clings to life, wants to say well, hang in there, maybe something will happen, maybe you'll get out before you're old, and my other part says well, better than that as it has been said, Parole Board made one mistake, they are not likely to make another." In sum, Del Vecchio does not show a due process violation because of the prosecutor's statements.[5]

2. Equal protection.

■ The Illinois Supreme Court has held, as a matter of Illinois statutory law, that a

---

After oral argument in this case, the United States Supreme Court decided *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In *Simmons*, the prosecutors pursued a line of argument about the defendant's "future dangerousness." In response, the defendant requested an instruction informing the jury that there was no possibility that he would be paroled under South Carolina law. The trial court denied the instruction, and the defendant, who had physically and sexually assaulted at least three elderly women (including his own grandmother) before killing a fourth, was sentenced to death. On direct appeal, the United States Supreme Court reversed the death sentence, ruling that the failure to give the defendant's proffered instruction on the impossibility of parole violated his due process rights.

*Simmons* does not apply here. In *Simmons* the court rested its decision on the defendant's due process right to be heard on a matter of importance. *Simmons* at ——, 114 S.Ct. at 2192 ("The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain,'" quoting *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977).). Here Del Vecchio never requested an instruction similar to the one the South Carolina court rejected in *Simmons*. Nor does Del Vecchio contend that he was prohibited in any way from informing the jury about his view that under Illinois law there was no possibility he would be paroled. If anything he raised the question himself by musing about the "Parole Board" and getting "out before [he's] old." Unlike Simmons, he had every opportunity to deny or explain. He was not denied his right to be heard.

prosecutor's statements about the possibility of future parole are not relevant in a capital sentencing hearing. In at least four cases, that court has overturned the imposition of the death penalty because prosecutors made explicit references to the possibility of parole when arguing to the jury. *People v. Walker*, 91 Ill.2d 502, 64 Ill.Dec. 531, 440 N.E.2d 83 (1982); *People v. Szabo*, 94 Ill.2d 327, 68 Ill.Dec. 935, 447 N.E.2d 193 (1983); *People v. Brisbon*, 106 Ill.2d 342, 88 Ill.Dec. 87, 478 N.E.2d 402 (1985); and, *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988). Apparently, the Illinois Supreme Court has determined that even though the Constitution does not prohibit explicit references to parole during the capital sentencing hearing, *see Ramos*, 463 U.S. at 992, 103 S.Ct. at 3446, such references have no place in an Illinois courtroom.

When Del Vecchio appealed his death sentence to the Illinois Supreme Court, he claimed that the prosecutor's reference to "experts" at the sentencing hearing violated this Illinois law. He argued that his death sentence should be overturned like those in *Walker* and *Szabo* (*Brisbon* and *Gacho* had not yet been decided). The Illinois Supreme Court ruled that Del Vecchio was not entitled to the protection it carved out in *Walker*: "[w]e find *Walker* distinguishable in that there is no evidence that the possibility of parole was a factor considered in the jury's deliberations." 86 Ill.Dec. at 472, 475 N.E.2d at 851.

Sometime after the Illinois Supreme Court resolved Del Vecchio's direct appeal, it decided *Brisbon*, where it again applied the rule it had established in *Walker*. When Del Vecchio brought his second appeal to that court, he argued that *Brisbon* extended the rule stated in *Walker*, so that he was entitled to have his death sentence overturned. The court responded that *Brisbon* simply restated the rule established in *Walker*, and reaffirmed that Del Vecchio was not entitled to the protection afforded by that rule:

> We noted above that in *Del Vecchio I*, we subjected the complained-of remarks to the test of our holding in *Walker*, as well as to the constitutional test. *Brisbon* was also decided by applying the *Walker* test.

The fact that different results, based on different facts and different cases, were achieved does not mean that the later case (*Brisbon*) overruled the former, *Del Vecchio I*. The rule of *Del Vecchio I* was not changed by *Brisbon* so that the rule of *Del Vecchio I* would only apply to Del Vecchio, as he now contends, thereby raising constitutional questions of equal protection or due process, or an eighth amendment violation. The rule applied in both *Del Vecchio I* and *Brisbon* is the same. Different results were achieved under different facts.

135 Ill.Dec. at 826, 544 N.E.2d at 322.

■ Del Vecchio argues that the Illinois Supreme Court's refusal to extend the *Walker* rule to the facts of his case violated his equal protection rights. But an equal protection violation occurs only when different legal standards are arbitrarily applied to similarly situated defendants. *Dobbert v. Florida*, 432 U.S. 282, 301, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977). The Illinois Supreme Court, and the district court in this case, have held that Del Vecchio was not situated similarly to the defendants in *Walker, Szabo, Brisbon*, and *Gacho*. The most basic difference those courts found was that while the prosecutor's comments in Del Vecchio's case were vague and nondescript, the prosecutors in *Walker, Szabo, Brisbon*, and *Gacho* all managed to inflame the respective juries by explicitly indicating that if the defendants were not executed, they would be paroled.

Of course, if the Illinois Supreme Court's distinction in Del Vecchio's case appeared arbitrary, it might raise equal protection concerns. But the Illinois Supreme Court's handling of Del Vecchio does not appear arbitrary. That court carefully considered the protection it carved out in *Walker*, and determined that Del Vecchio was not entitled to it. The court made a principled distinction: the reference to "experts" in Del Vecchio's case was vague and nondescript while the other cases involved specific references to parole. The Illinois Supreme Court certainly did not offend the equal protection clause by refusing to extend the *Walker* protection to the unique facts of Del Vecchio's case. That court established this protection; that court

is entitled to define its limits. *See Estelle v. McGuire*, 502 U.S. at ——, 112 S.Ct. at 480 ("it is not the province of a federal habeas court to re-examine the state court determination on state law questions."). The Illinois Supreme Court can best determine the scope of one of its own evidentiary rulings.

## B. Perjury

 Del Vecchio introduced evidence at his death sentencing hearing that he was high on drugs when he killed young Tony Canzonieri. He claimed that this was a mitigating circumstance against imposing the death penalty. The state countered with evidence that Del Vecchio always blamed his violence on drug use. The state argued that Del Vecchio was more a dangerous malingerer to be feared, than just a drug addict to be pitied. To bolster this point, the state called police officer John Motzny as a witness. He had investigated the 1965 murder of Fred Christiansen. He testified that Del Vecchio had used the same excuse in 1965—that he was high on drugs at the time of the murder. Motzny also testified that he had questioned Del Vecchio's mother, Yvonne Del Vecchio, in 1965 about whether she knew that her son used drugs. According to Motzny, she stated that she was unaware of any drug use by her son.

Del Vecchio claims that Motzny committed perjury when he testified about Yvonne's statement. Del Vecchio has submitted a number of documents in this case meant to prove the perjury. The documents consist mostly of police records which indicate that there was some evidence of Del Vecchio's drug use in 1965. After reviewing this information, the district court in this case was not convinced that perjury occurred. *See* summary of documentary evidence, and district court's legal conclusions at *Del Vecchio v. Illinois Dept. of Corrections*, 795 F.Supp. 1406, 1418–19 (N.D.Ill.1992). We need not recount the documentary evidence or the legal standards here. It suffices to say that we agree with the district court's analysis of the evidence, and its conclusion that the evidence does not establish the type of "palpable testimonial contradiction or untruth" that is necessary to indicate perjury. *Anderson*

*v. United States*, 403 F.2d 451, 454 (7th Cir.1968). Just because there is evidence that Del Vecchio used drugs in 1965, does not necessarily mean that Motzny lied when he testified about Yvonne's statements. We add to the district court's analysis, that in order to prove a constitutional violation based on perjured testimony, Del Vecchio was required to show the prosecutors knowingly and intelligently introduced the allegedly false testimony at trial. *Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir.1980). But Del Vecchio presents no evidence of knowledge. He presents only the above mentioned documents. If we cannot conclusively say that Del Vecchio was a drug user in 1965 based on the documents, we also cannot conclude that Officer Motzny knew about drug use but testified falsely, and worse, that the prosecutors knew of his false testimony and introduced it anyway.

## C. Ex Parte Hearsay

 To further support the argument that Del Vecchio was a dangerous malingerer who was in control of his faculties when he committed murder, the state called two experts to testify at the sentencing hearing: Dr. Richard Rogers, a clinical psychologist, and Dr. James Cavanaugh, a psychiatrist. They both testified that, in their opinions, Del Vecchio "was sane at the time of the offenses, was a sociopath and a malingerer who at the time of the offense was not suffering from extreme mental or emotional distress." *Del Vecchio*, 86 Ill.Dec. at 472, 475 N.E.2d at 851. They further testified that they had perused medical reports from other psychiatrists who had examined Del Vecchio, and that the conclusions reached in those reports supported their opinions. Del Vecchio now claims that he was denied his Sixth Amendment right to confront witnesses because Drs. Rogers and Cavanaugh were allowed to repeat the conclusions of other psychiatrists who were not present to testify.

But courts have long sanctioned the use of hearsay at sentencing. *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980); *United States v. Agyemang*, 876 F.2d 1264, 1271 (7th Cir. 1989); *see also United States v. Beal*, 960

F.2d 629, 634 (7th Cir.1992); Fed.R.Evid. 1101(d)(3). There is no exception to this rule in a capital case. *Williams v. New York,* 337 U.S. 241, 251, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949); *see also Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (application of hearsay rule to preclude the defendant from introducing mitigating evidence at sentencing in a capital case violates due process). The Constitution allows the hearsay rules to be relaxed, quite simply, to expand the deposit of information available to the sentencing tribunal. The Supreme Court has summarized this principle: "[a] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Roberts,* 445 U.S. at 556, 100 S.Ct. at 1362.

The trial court in Del Vecchio's case allowed this evidence under Ill.Rev.Stat. 1977, ch. 38, par. 9–1(e), which permits the admission of hearsay evidence at a capital sentencing hearing. That statute protects the defendant by providing that he "shall be given a fair opportunity to rebut any information received at the hearing." The Constitution, also, requires that the defendant be given the opportunity to rebut evidence which makes its way into the sentencing hearing because of the lax evidentiary standards. *Agyemang,* 876 F.2d at 1271–72. Del Vecchio was given this opportunity. He had access to the contested hearsay reports; he could have cross-examined Drs. Rogers and Cavanaugh about the reports; he could have called his own experts. Because he was given the opportunity to be heard, he cannot now succeed on this constitutional claim.

### D. *Miranda*

 Del Vecchio also claims that the 1965 confession was taken in violation of *Miranda,* 384 U.S. 436, 86 S.Ct. 1602. He argues, because of this, that the confession should not have been used in the 1979 sentencing hearing—it should have been precluded under the exclusionary rule. But the Supreme Court has held that *Miranda* does not apply retroactively. *Johnson v. New Jersey,* 384 U.S. 719, 721, 86 S.Ct. 1772, 1775, 16 L.Ed.2d 882 (1966). Therefore, the con-

fession was not taken in violation of *Miranda.* Even so, Del Vecchio contends, the confession should not have been used in the 1979 sentencing hearing, which took place well after *Miranda* was decided. But even if we were to accept Del Vecchio's contention that the confession was taken in violation of *Miranda,* that violation would not require exclusion of the confession during the sentencing proceedings. The exclusionary rule is generally inapplicable during sentencing. *See United States v. McCrory,* 930 F.2d 63, 69 (D.C.Cir.1991); *United States v. Torres,* 926 F.2d 321, 325 (3d Cir.1991); *United States v. Graves,* 785 F.2d 870, 873 (10th Cir.1986); *United States v. Butler,* 680 F.2d 1055 (5th Cir.1982); *United States v. Schipani,* 435 F.2d 26, 28 (2d Cir.1970). *See also Stone v. Powell,* 428 U.S. 465, 486–87, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976). The exclusionary rule would have been especially inapplicable here, where there was really no deterrent effect in applying the rule; any police misconduct would have occurred fourteen years before the confession was introduced. *McCrory,* 930 F.2d at 69.

As with the previously discussed hearsay testimony, evidence which might be inadmissible at the guilt phase of a trial can be admitted at the sentencing phase, as long as the evidence is reliable. *See, e.g., Roberts,* 445 U.S. at 556, 100 S.Ct. at 1362; *Graves,* 785 F.2d at 875. Del Vecchio has done nothing to impugn the reliability of the confession; in fact, he used the confession in his 1965 sentencing hearing when it suited his case to do so. Therefore, the trial court did not violate the Constitution by admitting the confession during the sentencing hearing.

### E. *Jury Instructions*

Finally, Del Vecchio argues that the standard Illinois death penalty jury instructions failed to adequately inform the jury how to weigh aggravating and mitigating factors. He concedes that our decisions in *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), and *Williams v. Chrans,* 945 F.2d 926 (7th Cir. 1991)—in which we passed on the adequacy of the instructions—resolved this issue in favor of the state. He argues, however, that the district court's decision in *Free v. Peters,*

778 F.Supp. 431 (N.D.Ill.1991), 806 F.Supp. 705 (N.D.Ill.1992), called this circuit's law into question. But we reaffirmed the law of *Silagy* and *Williams* in *Gacy v. Wellborn,* 994 F.2d 305, 314 (7th Cir.1993), and we recently reversed the district court's decision in *Free. Free v. Peters,* 12 F.3d 700 (7th Cir.1993). Therefore, *Silagy* and *Williams* remain the law of this circuit. The jury instructions at issue are not constitutionally deficient.

## V.

The state of Illinois gave George Del Vecchio a fair trial for Tony Canzonieri's murder. The Constitution requires no more. We affirm the district court to the extent that it denied the petition. We reverse the district court's decision to order an evidentiary hearing on the voluntariness of the 1965 confession, and remand with instructions to deny the petition.

**Affirmed in part, reversed in part, and remanded with instructions to deny the petition.**

EASTERBROOK, Circuit Judge, concurring.

I join the majority's opinion and add a few thoughts on the question whether an "appearance of impropriety" by the presiding judge means that the conviction violates the due process clause of the fourteenth amendment to the Constitution.

"Appearance" problems lurk everywhere, for they are in the eye of the beholder. A suspicious observer might believe that Judge Garippo "went easy" on Del Vecchio in his role as prosecutor, creating the appearance that as judge he cracked down to make up for his mistake. This brand of argument cannot be cabined. Suppose Prosecutor Garippo had insisted on an adult sentence for Del Vecchio; would our skeptic not then say that Judge Garippo, knowing that a hard line had not done its work, would be more inclined to favor death, as the only sure means of incapacitation? The same kind of argument could be made if Judge Garippo's encounter with Del Vecchio had been as a judge in an earlier case. Whether he gave a light, normal, or stiff sentence the first time, it could be said to "appear" that this strategy failed, leading to severity on the second trial. But see *Liteky v. United States,* —— U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). By a similar approach hearing a case involving a litigant who used to be the judge's client, or a case presented by a lawyer who used to be his partner, would convey a bad appearance. A disqualification rule based on connections to lawyers and litigants would relieve a majority of this court of all cases involving the national government, because six of us formerly worked in the Department of Justice.

I appreciate that many persons would feel more comfortable if judges did not hear cases in these categories. See *United States v. Murphy,* 768 F.2d 1518, 1536–41 (7th Cir. 1985). American law has been marked by progressively more restrictive rules of disqualification, responding to changing views of the judicial role. See G. Edward White, *Patterns of American Legal Thought* 99–143 (1978). Developments in statutory and common law do not feed back, through the due process clauses, to become part of the Constitution. For more than two hundred years American law has treated ethical norms as within the control of living legislators and judges, who alter the rules to suit contemporary understandings of wise judicial conduct. Disqualification statutes and codes of judicial ethics are the work of the twentieth century. The statute disqualifying federal judges who are biased, 28 U.S.C. § 144, was enacted in 1911. 36 Stat. 1090. In 1942 the Conference of Senior Circuit Judges (the precursor to the Judicial Conference of the United States) adopted a resolution discouraging judges from sitting in cases in which near relatives were lawyers. See 28 A.B.A.J. 817, 820 (1942). Until then the practice had been common. A formal Code of Conduct for United States Judges was first adopted in 1973. Not until 1974 was there any requirement that federal judges refrain from sitting when their impartiality might reasonably be questioned. 28 U.S.C. § 455(a). The Constitution does not contain a ratchet, ensuring that every new rule protecting the appearance of propriety becomes insulated from change by political actors and that every

improvement in federal statutory law applies to state judiciaries.

The due process clauses come from English jurisprudence, which had a simple rule: "a judge was disqualified for direct pecuniary interest and for nothing else." John P. Frank, *Disqualification of Judges,* 56 Yale L.J. 605, 609 (1947). British law rejected the proposition that judges could be disqualified for bias of any other kind. *Id.* at 609–12 (recounting English cases and commentators); see also William Blackstone, 3 *Commentaries on the Laws of England* *361 (1768). The United States took over that tradition, and through the nineteenth century judges saw no difficulty in sitting when their relatives were parties (or lawyers), or in hearing appeals from their own decisions. See G. Edward White, III *History of the Supreme Court of the United States: The Marshall Court and Cultural Change, 1815–35* 181–200 (1988); David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years* 76 (1985); Frank, 56 Yale L.J. at 615–18.

Our legal culture's most revered judicial decision, *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), was rendered by John Marshall—who just happened to be the cause of the litigation. Secretary of State Marshall left Marbury's commission behind in his desk at the end of the Adams Administration when he departed to become Chief Justice and write the opinion disposing of the ensuing litigation. Did the other Justices, all active in the writing or approval of the Constitution, overlook a glaring violation of the due process clause of the fifth amendment? Chief Justice Chase, present at the creation of the fourteenth amendment, sat in judgment on the constitutionality of the greenback legislation he had devised as Secretary of the Treasury and for which he had risked

his political neck. See *Hepburn v. Griswold,* 8 Wall. (75 U.S.) 603, 19 L.Ed. 513 (1870); *The Legal Tender Cases,* 12 Wall. (79 U.S.) 457, 20 L.Ed. 287 (1871); Charles Fairman, VI *History of the Supreme Court of the United States: Reconstruction and Reunion 1864–88 Part I* 677–775 (1971). Did all of the members of that Court miss the constitutional implications of such a step? The First Congress enacted a Judiciary Act that led Justices to hear appeals from their own decisions on circuit. Not until 1891, with the creation of the courts of appeals, was the procedure for an "appeal" from a judge to himself abolished.[†] Did legislators and judges for 114 years fail to appreciate the "appearance" problem, and thus the unconstitutionality of the entire federal judicial system? Vestiges of the old system are evident in today's decision. Three members of the en banc court were on the panel and so are visiting this case for a second time. All three believe that their first decision was correct; does this create a problem under the due process clause?

Whatever one may say about the prudence of Chief Justice Marshall's decision to sit in *Marbury,* or Chief Justice Chase's to sit in the greenback cases, I do not think that either violated the Constitution. See *Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, J., in chambers) (collecting other examples); *United States v. Bonds,* 18 F.3d 1327 (6th Cir.1994) (Boggs, J., in chambers); *Schurz Communications, Inc. v. FCC,* 982 F.2d 1057 (7th Cir.1992) (Posner, J., in chambers). These incidents also show the dangers of inferring prejudgment from prior activities: Chief Justice Chase confounded President Lincoln's expectations by voting to hold the legislation unconstitutional, and Chief Justice Marshall

---

[†] The Justices did not have to sit in review of decisions in which they had participated on circuit, but they did. The situation of district judges was more complex. The Judiciary Act of 1789 provided that these judges, when sitting on the circuit courts, could not hear appeals from their own decisions but could publish opinions explaining their original decisions. 1 Stat. 73, 74 (1789). When in 1793 Congress reduced from two to one the number of Justices needed to constitute a circuit court, this sometimes obliged the district judge to participate in the review of his own decision. The practice became common after 1875, when the addition of federal-question jurisdiction coupled with the shortage of circuit judges obliged circuit courts to convene with only the district judges in attendance. See Walter B. Hill, *The Federal Judicial System,* 12 A.B.A. Rep. 289 (1889). The practice did not end until the Evarts Act of 1891 created the institution that in 1911 was titled the United States Court of Appeals.

withheld the commission from fellow-Federalist Marbury.

My conclusion that disqualification for "appearance of impropriety" is a subject for statutes, codes of ethics, and common law, rather than a constitutional command, would be of but academic interest if the Supreme Court had authoritatively decided to the contrary. None of that Court's constitutional decisions, however, establishes that an "appearance" problem—as opposed to actual bias—invalidates a judgment. To the contrary, the theme of the cases is exactly the common law rule: a judge with a financial interest in the outcome of the case may not sit. E.g., *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Ward v. Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). At the same time, the Court tolerates evidence of bias that creates undeniable "appearance" problems:

> Appellant contends Justice Embry's general hostility towards insurance companies that were dilatory in paying claims, as expressed in his deposition, requires a conclusion that the Due Process Clause was violated by his participation in the disposition of this case. The Court has recognized that not "[a]ll questions of judicial qualification ... involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); see also *FTC v. Cement Institute,* 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level"). Moreover, the traditional common-law rule was that disqualification for bias or prejudice was not permitted. See, e.g., *Clyma v. Kennedy,* 64 Conn. 310, 29 A. 539 (1894). See generally Frank, *Disqualification of Judges,* 56 Yale L.J. 605 (1947). As Blackstone put it, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3

W. Blackstone, *Commentaries* *361. The more recent trend has been towards the adoption of statutes that permit disqualification for bias or prejudice. See *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921) (enforcing statute disqualifying federal judges in certain circumstances for personal bias or prejudice). See also ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980) ("A judge should disqualify himself ... where he has a personal bias or prejudice concerning a party"). But that alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause. We held in *Patterson v. New York,* 432 U.S. 197, 201–202, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) (citations omitted), that

> it is normally within the power of the State to regulate procedures under which its laws are carried out ... and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

We need not decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal. Certainly only in the most extreme of cases would disqualification on this basis be constitutionally required, and appellant's arguments here fall well below that level. Appellant suggests that Justice Embry's general frustration with insurance companies reveals a disqualifying bias, but it is likely that many claimants have developed hostile feelings from the frustration in awaiting settlement of insurance claims. Insurers, on their side, have no easy task, especially when trying to evaluate whether certain medical diagnostic tests or prolonged hospitalization were indicated. In turn, the physicians and surgeons, whether impelled by valid medical judgment or by apprehension as to future malpractice claims—or some combination of the two—similarly face difficult problems. Appellant's allegations of bias and

prejudice on this general basis, however, are insufficient to establish any constitutional violation.

*Aetna,* 475 U.S. at 820–21, 106 S.Ct. at 1585 (brackets in original). See also *Liteky,* —— U.S. at ——, 114 S.Ct. at 1155–57.

Cases sometimes treated as examples of "appearance" problems actually have different emphases. For example, *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), held that a judge should not preside in a case in which he was the *victim* of a crime. The contemptuous remarks had been directed to the judge, and although historical practice would have allowed the judge to mete out summary punishment, it did not allow the judge to preside at a later trial. *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), dealt with a combination of prosecutorial and judicial functions that left the judge not only confused about his role but also in possession of evidence he should not have known. See *Withrow v. Larkin,* 421 U.S. 35, 53, 95 S.Ct. 1456, 1467, 43 L.Ed.2d 712 (1975). Thus *Murchison* holds that the due process clause requires a trial to be limited to evidence heard in court, not that the Constitution precludes adjudication whenever the judge appears to have prejudged matters. An "appearance" of impropriety alone has never led the Supreme Court to find that a party did not receive due process of law.

Our notions of proper judicial conduct are just that—ideas about *propriety* rather than about constitutional minima that everyone must accept. That is why the Court distinguished in *Aetna* between a financial stake in the outcome of the case and a dislike of insurance companies. Judges and legislators alike may be held accountable when their ideas about proprieties lead the public to believe that the quality of justice has deteriorated—even if the perceptions are incorrect. Dealing with this problem is an important task for the living; we ought not pretend that it was settled two hundred years ago, and that everything is out of contemporary hands. Federal judges are free to, and should, expect more than the constitutional minimum from themselves, but we cannot insist that the states do likewise.

CUMMINGS, Circuit Judge, joined by CUDAHY, RIPPLE, and ROVNER, Circuit Judges, dissenting.

Judge Garippo ought not to have presided over the Canzoneri trial. His intimate involvement in the Christiansen proceeding; the unfortunate connection between the disposition of that case and Del Vecchio's subsequent murderous behavior; the necessity of ruling, as judge, regarding decisions that he himself had previously made as prosecutor— all of these factors suggest, in the words of the majority, *ante* at page 1371, such an "actual incentive . . . to be biased" that recusal is required. The Due Process Clause of the Fourteenth Amendment mandates this result even if in this case the judge was not in fact biased.

The majority concludes otherwise. Our disagreement is due in part to our differing interpretations of recent Supreme Court jurisprudence. Of much greater import, however, is our disagreement over what actually occurred in the Christiansen and Canzoneri proceedings. The majority's version is as follows: "[Louis Garippo] was only tangentially involved in Del Vecchio's 1965 prosecution. His decisions regarding the prosecution had little if anything to do with Del Vecchio being a free man in 1977, when he killed Tony Canzoneri." Maj.Op. at page 1370, *ante.* Moreover, because the sentence that Del Vecchio received upon his transfer from a youth facility to an adult penitentiary was the very same minimum sentence that would have applied had he been initially convicted and tried after his seventeenth birthday, the majority claims that the decision to expedite Del Vecchio's indictment merely "allowed [him] to spend the first four years of his sentence in a youth correctional facility, rather than in an adult prison." *Id.* at page 1378, *ante.*

The majority then concludes that Judge Garippo was unlikely to have had any particularly strong feelings—the sort of feelings that would arguably make him unfit to preside over the Canzoneri trial—about the fact that Del Vecchio was freed from prison after the Christiansen killing just in time to commit a second, gruesome murder. *Id.* In-

deed, the majority goes so far as to suggest, by lengthy analogy, that Judge Garippo might not even have remembered his role in the Christiansen case by the time Del Vecchio appeared before him in the Canzoneri trial. *Id.* at page 1371, *ante.* And if a judge is not even aware of circumstances which, if known to him, might bias him against a party, how could it violate due process principles for him to preside at trial? So reasons the majority.[1]

If this version of events were even plausible, I would not dissent today. However, the majority has obfuscated both Garippo's role in the Christiansen prosecution and Del Vecchio's theory of its biasing influence on the Canzoneri proceedings. First, Garippo was intimately involved in the prosecution of the Christiansen case. Second, the decisions that he made in that case directly influenced Del Vecchio's being free to kill again in 1977. Third, Garippo was aware when he made those decisions that they could well result in Del Vecchio's imminent release. Finally, the record clearly establishes that Garippo remembered his extensive role in the Christiansen case when Del Vecchio first appeared before him in the Canzoneri trial.

Thus the appearance of bias that results from allowing Garippo to sit as judge over Del Vecchio's subsequent trial—and to evaluate the propriety of his own earlier prosecutorial decisions—is such that Del Vecchio was clearly denied due process of law. Cf. *Aetna Life Insurance Company v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 ("The Due Process Clause may sometimes bar trial by judges who have no actual bias.... But to perform its high function in the best way, justice must satisfy the appearance of justice." (Internal quotation marks and citations omitted.)).

First, Garippo was not, as the majority claims, merely "tangentially" involved in the Del Vecchio prosecution. The record is clear that every major decision involving Del Vecchio's prosecution in the Christiansen case was either made or approved by Garippo.

The entire Christiansen proceedings took less than a month—Del Vecchio was initially interrogated on February 2, 1965, when he confessed to the Christiansen killing, and he pleaded guilty and was sentenced on February 24 of that same year. *People v. Del Vecchio,* 129 Ill.2d 265, 273, 135 Ill.Dec. 816, 544 N.E.2d 312 (1989), certiorari denied, 494 U.S. 1062, 110 S.Ct. 1540, 108 L.Ed.2d 779. During that time Garippo "probably" reviewed memoranda concerning Del Vecchio's initial confession. Garippo Dep. at 6. He assigned the case to his former trial partner to prosecute. *Id.* He was involved in the decision to prosecute Del Vecchio as an adult. *Id.* at 10. He made the decision to expedite Del Vecchio's indictment so as to allow him to plead guilty prior to his seventeenth birthday. *Id.* at 17–18. He even attended, as a spectator, Del Vecchio's guilty plea and sentencing hearing. *Id.* at 19. It is hard to imagine any prosecutorial decisions during that month with which Garippo was *not* involved.

Indeed, as Garippo himself noted, there were only two important decisions to be made in the case: whether to prosecute Del Vecchio as an adult, and whether to expedite the indictment. *Id.* at 17. Garippo made both. Clearly his involvement in the Christiansen case was much more than tangential. Garippo was the key decision-maker throughout the proceedings.

Second, it is clear that the decision to expedite Del Vecchio's indictment—the effect of which was to postpone his receiving an adult sentence until after his twenty-first birthday—directly influenced the length of that sentence and therefore contributed to Del Vecchio's being free, in 1977, to kill Tony Canzoneri. It is mere sophistry to suggest, as does the majority at pages 1377–78, *ante,* that "It just so happened that the judge in 1971 decided to be lenient. In retrospect, there is no telling whether a judge asked to sentence Del Vecchio as an adult in 1965 would have been lenient.... Granted, Del

---

1. In introducing this reasoning, the majority invites the reader to "Consider the following hypothetical"—a judge who is unaware of circumstances that would, if known to him, clearly require his recusal. Maj.Op. at page 1371, *ante.*

Despite the later disclaimer that this hypothetical is not meant to call Judge Garippo to mind, *id.* at page 1371 n. 1, it is difficult to discern any other reason for employing such a suggestive fact-pattern.

Vecchio ultimately received a light sentence [for the Christiansen murder], but this light treatment was not because of prosecutor Garippo."

This reasoning strains credulity. In 1965 Del Vecchio was widely perceived as a drug-crazed killer. The suggestion that if Del Vecchio had been sentenced at that time he would have received the statutory minimum is absurd. In 1965 the newspapers abounded with stories about the "teen addicts" who, "high on goofballs," "shot [their] victim 19 times" in order to recover eleven dollars. Indeed, in February and March 1965 there were at least 39 stories in four major papers about the crime itself, the gentle character of the victim, the brutal natures of the perpetrators, and the heroism of the detectives who solved the crime, as well as background stories about the drug trade. R. 13–4. A judge in 1965 would be presented with information that overwhelmingly militated in favor of a substantial sentence; he would be presented with almost no information in mitigation.

But the George Del Vecchio who was sentenced in 1971 to the statutory minimum appeared as a very different George Del Vecchio from the one who would have been sentenced in 1965 if Garippo had initially chosen to delay the indictment. By 1971 Del Vecchio had been afforded six years in which to refurbish his image, four in a youth facility and two in an adult penitentiary. He was so successful that the staff at the Illinois Youth Commission unanimously objected to his transfer to an adult facility, instead recommending immediate parole. PX. 4 at 12, 24–25. Even the prosecutor at Del Vecchio's 1971 sentencing commented that he had done everything possible to rehabilitate himself. PX. 4 at 32. Del Vecchio's relatively short sentence in 1971 was clearly attributable to his apparent rehabilitation since 1965.[2] That he had the opportunity to rehabilitate himself prior to sentencing was a direct result of the decision to expedite his indictment and thereby delay his adult sentencing.

Third, the majority incorrectly portrays the nature of the decision that Garippo made when he expedited the indictment so that Del Vecchio could plead guilty prior to his seventeenth birthday. The majority suggests at page 1378, *ante,* that "the only break Del Vecchio received because of the quick indictment was that he was allowed to spend the first four years of his incarceration in a youth correctional facility, rather than in an adult prison." Of course, the other "break" Del Vecchio received was the opportunity to rehabilitate himself prior to sentencing. But putting this to one side, it is clear that the decision made by Garippo was more momentous than the majority chooses to recognize.

Garippo's decision to expedite the indictment created the risk that Del Vecchio would be released without spending any time at all in an adult facility; indeed, it created a risk that he would be released immediately. In 1965 Illinois law provided that a male convicted and sentenced as an adult before his seventeenth birthday was committed to the Illinois Youth Commission (IYC) with no mandatory minimum term—the IYC could release him immediately or at any time prior to his twenty-first birthday. When he turned twenty-one, the IYC could release him or transfer him to an adult penitentiary, Ill.Rev.Stat. ch. 23, § 2523 (1963), apparently with or without a new sentencing. Garippo Dep. at 12–13. By contrast, had Del Vecchio been convicted and sentenced just after his seventeenth birthday he would have been sent to an adult penitentiary with a minimum sentence of fourteen years and a maximum sentence of life in prison. Ill.Rev.Stat. ch. 38, § 9–1 (1963).

The majority therefore overlooks the import of allowing Del Vecchio to be sentenced just prior to, rather than just after, his seventeenth birthday. When Garippo made the crucial decision to allow an expedited indictment he placed society at risk that Del Vecchio would be released before serving anything like the statutory minimum term. In the face of what the majority itself characterizes, page 1367 *ante,* as "enormous publicity"

---

2. The majority itself recognizes this fact on page 1368, *ante,* when it notes that "During his stay at the youth facility, Del Vecchio had achieved a sterling record and [Judge Richard Fitzgerald] apparently took that into consideration."

for a "random act[ ] of violence to gain drug money"—at that time an almost-unprecedented event—Garippo chose, for whatever reason, to make Del Vecchio eligible for release at any time prior to his twenty-first birthday.[3] Did he feel, contrary to overwhelming public opinion, that Del Vecchio was rehabilitable? If so, then subsequent events proved him tragically wrong. Whatever his reasons for granting Del Vecchio's request for an expedited indictment, Garippo was aware of the substantial risks attendant upon allowing Del Vecchio to be sentenced before he turned seventeen.

Garippo's curious decision to expedite the indictment must form the backdrop for his later discovery that Del Vecchio had been released from prison and had murdered a small child by partially severing his head. Against this backdrop it is not unreasonable to conclude that Garippo could have had an immediate, visceral reaction to learning that he was to preside at the Canzoneri trial.

It is absurd to suggest, as does the majority, that Garippo might not even have remembered his role in the Christiansen case by the time Del Vecchio appeared before him in the Canzoneri trial. The very name "Del Vecchio" must have recalled to Judge Garippo the headlines that had blared "Teen Addicts' Slay Story: 'Laughed as Victim Died'—'He Wouldn't Stop Screaming.'" R. 13–4. Indeed, Del Vecchio's name clearly triggered some response, since Judge Garippo went out of his way to obtain and review the Christiansen case file prior to the Canzoneri trial. In any case, whatever prompted the recollection, Garippo explicitly acknowledged in his deposition testimony that he was aware, prior to the Canzoneri trial, of his own role in the Christiansen prosecution. Garippo Dep. at 19–20.

The majority correctly observes that "[w]hat may appear bad to an observer, especially in hindsight, may not have influenced—or, more importantly, may not have had any real possibility to influence—the judge in his decision-making process." Maj.Op. at page 1371, *ante.* And as the majority discusses at some length, this would be the case if, by chance, the judge were totally ignorant of those circumstances that, if known to him, would cause him to be biased. These observations, however, have absolutely no bearing on the case at bar. Judge Garippo was completely aware of the circumstances that Del Vecchio now argues placed him under a conflict of interest. The only question is whether these circumstances provided—in the words of the majority, page 1371 *ante*—an "actual incentive ... for [Garippo] to be biased."

The answer to this question is obvious. Garippo made every key decision in the Christiansen prosecution, including a decision that placed society at risk of Del Vecchio's imminent release. This decision directly resulted in Del Vecchio's eventual light sentence and early release. When Del Vecchio killed again, in a horrifying and senseless fashion, any judge in Garippo's situation would have felt a strong personal connection to the case. Indeed, a judge in Garippo's position might well have felt that Del Vecchio had "dirtied [that judge's] sweatshirt"—a phrase used by Garippo himself to describe how "very offended" he would feel if someone he had treated leniently proved not to have deserved it. · Garippo Dep. at 32.

At the time of the Canzoneri trial a defendant such as Del Vecchio "[could] with reason say that he feared he could not get a fair trial" before Judge Garippo. *Tumey v. Ohio,* 273 U.S. 510, 533, 47 S.Ct. 437, 444, 71 L.Ed. 749. This is sufficient to require Judge Garippo's recusal, without any further inquiry into Garippo's actual state of mind. Moreover, Garippo's behavior during and after

---

**3.** The decision to expedite the indictment, allowing Del Vecchio to plead guilty prior to his seventeenth birthday and therefore be sentenced to an indefinite term in a youth facility, is indeed puzzling. Del Vecchio had confessed to having committed a widely publicized crime of horrifying brutality. He offered to plead guilty to that crime if he could do so prior to his turning seventeen, thereby giving him the opportunity for release at any time prior to his twenty-first birthday. It is difficult to see the advantage to the state in accepting Del Vecchio's guilty plea in exchange for expediting the indictment. Delaying the indictment would ensure that Del Vecchio received a definite sentence with no possibility of immediate release, while the detailed confession virtually guaranteed conviction.

that trial was such as to reinforce in the mind of a reasonable defendant the perception that a fair trial before Judge Garippo could not be had. First, because the earlier Christiansen proceedings were inextricably linked to many issues that arose in the Canzoneri trial, Judge Garippo was forced to revisit many of his earlier prosecutorial decisions. He should never have been placed in such a position. But putting to one side any substantive issues raised in the trial itself, Judge Garippo's actions in regard to the very issue of his own possible disqualification serve to underscore the impropriety of his presiding over the Canzoneri trial.

Had the defense been aware of Garippo's extensive involvement in the Christiansen case early in the Canzoneri proceedings, it could have filed a motion for substitution of judges, either for cause or as of right. Ill. Rev.Stat. ch. 38, § 114–5 (1963) (amended subsequent to 1978, see 725 ILCS 5/114–5 (1992)). But Garippo did not reveal even the fact of his earlier involvement, let alone its extent, to the defense. Indeed, the defense did not discover the fact of Garippo's involvement in the Christiansen prosecution until 1986, when all direct appeals had been exhausted. Judge Garippo's silence on this issue prevented the defense from exercising its right to replace him.

Even when the issue of Judge Garippo's conflict of interest was raised in state court collateral proceedings, the extent of Garippo's involvement in the Christiansen case was not revealed. Had the defense been able to bring Garippo's true role in the Christiansen prosecution before the Illinois Supreme Court, it is likely this issue would not be before us now. Upon Del Vecchio's collateral attack, that court explicitly held that had Garippo "acted as counsel" to the state in the Christiansen matter, then he would have been disqualified to preside over the Canzoneri trial. *People v. Del Vecchio*, 129 Ill.2d at 277, 135 Ill.Dec. 816, 544 N.E.2d 312. It concluded, however, that because Garippo's role in the Christiansen prosecution was "limited" and thus that he had not "acted as counsel" to the state, it was not improper for

him to preside over the Canzoneri trial. *Id.* at 277–278, 135 Ill.Dec. 816, 544 N.E.2d 312.

The court reached the conclusion that Garippo had not acted as counsel to the state in the Christiansen case on the basis of an affidavit submitted by Garippo stating that he had performed only two tasks in regard to that case—assigning it to a prosecuting attorney and agreeing to expedite the indictment. *Id.* at 277, 135 Ill.Dec. 816, 544 N.E.2d 312. He twice characterized his involvement as "limited." R. 13–2 at 360–361. In fact, when Garippo's deposition was obtained—after the district court in this habeas proceeding ordered the discovery that had been denied Del Vecchio by the state—it became clear that Garippo's involvement in the Christiansen case was not limited to two tasks and that his role in the prosecution was not minor. Had Garippo been more forthcoming during the state collateral proceedings, the Illinois Supreme Court might well have reached a different conclusion regarding whether he had "acted as counsel" to the state.

The picture that emerges from this chronicle of events is of a judge who actively wanted to preside over the Canzoneri trial, and who, having done so, resisted efforts to scrutinize the propriety of that decision. I wish to stress that the proper conclusion to draw from this is not that Garippo intended to treat Del Vecchio unfairly in his courtroom, but merely that Garippo had an unusually strong interest in remaining on the case. While Judge Garippo's desire to preside over the Canzoneri trial is quite natural, given his previous experience with the defendant, the fact that Garippo felt so strongly about this trial demonstrates the unwisdom of his presiding over it. "Justice must satisfy the appearance of justice." *Aetna*, 475 U.S. at 825, 106 S.Ct. at 1587, quoting with approval *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942. As the Supreme Court recently explained, determining whether a judge's participation in a case violated the litigants' due process rights does not require determining whether the judge was in fact influenced against a party. *Aetna*, 475 U.S. at 825, 106 S.Ct. at 1587. Rather,

sometimes the appearance of bias is so strong that a judge must be disqualified without any showing that he was in fact biased.[4]

The majority chides me for taking too seriously, in its view, the "'appearance of justice' language from *Murchison* and *Aetna*." Maj.Op. at page 1371, *ante;* see also Judge Easterbrook's concurrence generally.

The majority and the concurrence prefer to overlook the Supreme Court's continued approval of this language,[5] and to re-analyze the facts of each case in order to discern what they take to be the actual rule of decision. But we are not authorized to limit an entire line of Supreme Court cases strictly to their facts,[6] disregarding what that Court has explicitly identified as the organizing principle.

**4.** Because the circumstances under which Judge Garippo presided over the Canzoneri trial mandate issuance of a writ of habeas corpus, this dissent does not discuss many of Del Vecchio's other claims of constitutional error in the state proceedings. However, I am by no means as sanguine as the majority that *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), is inapplicable to the facts of this case. Cf. Maj.Op. at page 1385 n. 5, *ante*. *Simmons* held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." —— U.S. at ——, 114 S.Ct. at 2189 (Blackmun, J., joined by Stevens, Souter, and Ginsburg, JJ.); cf. *id.* at ——, 114 S.Ct. at 2201 (O'Connor, J., concurring in judgment, joined by Rehnquist, C.J., and Kennedy, J.).

In *Simmons,* the prosecution put the defendant's future dangerousness at issue by asking the jury to answer the question "what to do with [petitioner] now that he is in our midst" and exhorting the jury that a verdict for death would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Id.* at ——, 114 S.Ct. at 2190–91. In Del Vecchio's case, the prosecution put Del Vecchio's future dangerousness at issue by telling the jury to "protect [itself] from people like George Del Vecchio," to "demand [to be] protected from people like George Del Vecchio." The prosecution implied that if the jury did not sentence Del Vecchio to death, then he might some day be paroled: "You must, you can't leave it up to the experts. You can't trust the experts.... Don't put the decision on somebody else, because ... a few years from now there will be another expert who will be willing to come along and say he's fine." It is undisputed that Del Vecchio was sentenced pursuant to a statute that eliminated all possibility of parole. Ill.Rev.Stat. ch. 38, § 1003-3-3(d). Under these circumstances, *Simmons* appears to require "that the sentencing jury be informed that the defendant is parole ineligible." *Simmons,* at ——, 114 S.Ct. at ——. If Del Vecchio is correct that the sentencing jury was not so informed, then his due process rights were violated. It is unnecessary to explore *Simmons* (which is made complicated by the multitude of opinions issued by the Justices in that case) in greater detail because in Del Vecchio's

case other due process violations are readily apparent.

**5.** For cases that utilize this language in the context of recusal issues, see, *e.g., Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* —— U.S. ——, ——, 113 S.Ct. 2264, 2277, 124 L.Ed.2d 539; *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 865 n. 12, 108 S.Ct. 2194, 2205 n. 12, 100 L.Ed.2d 855; *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823; *Schweiker v. McClure,* 456 U.S. 188, 196, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1; *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 243, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182; *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532; *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942; *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11; cf. *J.E.B. v. Alabama,* —— U.S. ——, —— n. 3, 114 S.Ct. 1419, 1438 n. 3, 128 L.Ed.2d 89 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.) ("Wise observers have long understood that the appearance of justice is as important as its reality."); *Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (At issue is whether the judge is able to "'hold the balance nice, clear and true between the State and the accused....' In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's part.... 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less." Citations omitted.).

**6.** In fact, Seventh Circuit jurisprudence has never done so. As Judge Coffey noted very recently, "In our judicial system, 'justice must satisfy the appearance of justice' and administrative agencies, as well as administrative law judges, must avoid even the appearance of bias or partiality." *National Labor Relations Board v. Q-1 Motor Express, Inc.,* 25 F.3d 473 (7th Cir.1994) (Coffey, J., dissenting) (quoting from *In re Murchison,* 349 U.S. at 136, 75 S.Ct. at 625). If this venerable constitutional principle applies to administrative agencies determining whether to subject a company to a bargaining order, consider with how much more force it must apply to state court judges presiding in capital cases.

Moreover, any distinction to be made between the test proposed by the majority and the "appearance of justice" language that it abhors is primarily a semantic one. For the phrase "justice must satisfy the appearance of justice," the majority prefers to substitute "judges sometimes must recuse themselves when they face possible temptations to be biased." Maj.Op. at page 1372, *ante*. The majority then cautions that "even if Judge Garippo faced some 'possible temptation' to be biased . . . , not every 'possible temptation' to be biased presents a sufficient possibility of bias to require disqualification." *Id.* It explains that a "possible temptation to be biased" requires recusal only when experience teaches that "under a realistic appraisal of psychological tendencies and human weaknesses" the temptation poses too great a risk of actual bias. *Id.* at 1375, quoting *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712. But clearly the circumstances of the Canzoneri trial presented such a risk of actual bias that Judge Garippo (under a realistic appraisal of psychological tendencies and human weaknesses) ought not to have presided over it.[7]

A rule that requires recusal when the appearance of bias is as strong as it is in this case, without requiring an independent showing of actual bias, serves many ends. Not the least of these is to avoid the sort of after-the-fact dissection of a judge's motivations and behavior that two state courts, the district court, a divided appellate panel, and now this divided en banc Court, have regrettably been forced to practice in this case. Louis Garippo was held in high esteem as a state prosecutor and as a trial judge. (He has been in private practice since 1980. Garippo Dep. at 31.) His reputation is not unknown to many of us here on the Seventh Circuit. While I believe that Garippo's natural desire to preside over the second Del Vecchio trial obscured his ability to perceive what a grave conflict such a course of action entailed, I do not for a moment believe, nor do I wish to suggest, that Judge Garippo in any way intended to treat Del Vecchio unfairly. Indeed, I firmly believe that Judge Garippo thought he could put his personal feelings about the defendant aside and proceed in an impartial manner. Whether in fact he was correct or whether he was unfortunately mistaken does not matter. We must require strict adherence to the salutary rule that requires recusal whenever circumstances offer "a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the state and the accused." *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444, quoted with approval by *Aetna,* 475 U.S. at 825, 106 S.Ct. at 1587.

Such a rule protects the accused from the danger of unfair judging. It maintains for the benefit of society the appearance of justice so necessary to the continued esteem of the judicial system. Moreover, it protects judges such as Louis Garippo—fine individuals who "have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties," *Aetna,* 475 U.S. at 825, 106 S.Ct. at 625, quoting with approval *Murchison,* 349 U.S. at 136, 75 S.Ct. at 625; see also *Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 1587, 41 L.Ed.2d 897—from unseemly excursions into their psyches. The majority of this Court has held that Judge Garippo did not act improperly when he neither recused himself from the Del Vecchio trial nor revealed to the defense his role in the Christiansen case. But nothing the majority says can remove the cloud of doubt that now and forever hangs over the Del Vecchio trial that

7. The majority, unlike the concurrence, is willing to concede that "the due process clause sometimes requires a judge to recuse himself without a showing of actual bias." Maj.Op. at page 1371, *ante.* It rejects my use of the "appearance of justice" language because it erroneously interprets either that language or my dissent as suggesting that somehow "bad appearances alone" are always and by themselves sufficient to disqualify a judge from presiding over a particular case. See, *e.g., id.* at 1371, 1372. Rightly rejecting such an unduly broad interpretation of Su-

preme Court precedent, the majority proceeds to substitute its own inordinately narrow test for when a judge, not shown to be actually biased, must nonetheless recuse himself from a case. Our disagreement about the "appearance of justice" language, then, is really over whether it suggests a very narrow test for judicial recusal or whether it suggests a somewhat broader one. I submit that the Supreme Court's continued approval of the "appearance" language indicates that in cases like the one at bar, recusal is required by the due process clause.

the judge was irremediably biased. The tragedy is that Del Vecchio will go to his death as a result of this trial. The irony is that the appearance of such grave injustice could so easily have been avoided.

I respectfully dissent.

CUDAHY, Circuit Judge, dissenting.

I know Judge Garippo to have been an honorable and respected jurist. He is now a skillful and still respected practitioner. I therefore regret that I must dissent from the majority opinion—largely for the reasons explored at length and with great care by Judge Cummings. The standards governing the appearance of impropriety in death penalty proceedings cannot be too high. I am persuaded that appearances here do not measure up to those standards. I therefore respectfully dissent.

RIPPLE, Circuit Judge, with whom CUMMINGS, CUDAHY, and ROVNER, Circuit Judges, join, dissenting.

Because I believe that three of the arguments made by the petitioner to this court have merit, I respectfully dissent from the court's decision to deny all relief in this case. I shall not discuss here the government's cross-appeal; I agree with the analysis of Judge Cummings in the panel opinion. 8 F.3d 509. I shall limit this separate writing to the two other areas that I believe are meritorious.

A.

As Judge Cummings' thoughtful dissenting opinion demonstrates, and, I respectfully suggest, as the caselaw relied upon by the majority also demonstrates, the participation of the state trial judge in the petitioner's earlier prosecution for murder was a substantial, direct, and undisclosed conflict of interest. The basic difference between the majority and minority viewpoints is whether the interest of the trial judge was sufficiently substantial to require that the judge not participate. In my view, the fundamental

flaw in the perspective of the majority is its underestimation of the effect that considerations other than financial advantage can play in skewing judicial impartiality. The trial judge whose conduct was at issue here was, as several of my colleagues who know him have suggested, a public servant of significant reputation and influence in the Illinois bar. He was also required to stand for election. As Judge Cummings' opinion quite amply demonstrates, the petitioner's second murder called into question the wisdom of the decisions that this trial judge had made in an earlier stage of his career. Indeed, the prosecutor indirectly reminded him, and perhaps others, of that decision when he pleaded with the jury not to leave the future of the petitioner to "experts." It defies common knowledge of human nature, as well as recent American history,[1] to suggest that such a criticism is not taken personally, oftentimes very personally, by the public figure involved. For many, if not most, figures in public life, avoiding a cloud over one's professional judgment is a consideration a great deal more important than financial gain.

B.

While this court's focus has rested on the issue of the impartiality of the state trial judge, we ought not pass too quickly over the impact of the prosecutor's remark that the jury should not leave the petitioner's future in the hands of the "experts." The petitioner contended, both on direct appeal and on post-conviction review, that the prosecutor erred, as a matter of federal and state law, when he argued to the jury that the petitioner might be released on parole if he were not sentenced to death. The seriousness of the federal claim is clear after *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In addition, it seems obvious that the Illinois Supreme Court has been far from even-handed in its treatment of the problem. The caselaw in Illinois prior to the trial of the petitioner made clear that, in a capital case, argument on the possibility of parole is improper as a matter of state

---

1. *See, e.g.,* Robin Toner, *Prison Furloughs in Massachusetts Threaten Dukakis Record on Crime,* N.Y. Times, July 5, 1988, at B6 (discuss-ing the 1988 presidential election and Willie Horton).

law. *People v. Garcia*, 97 Ill.2d 58, 73 Ill. Dec. 414, 426, 454 N.E.2d 274, 286 (1983), cert. denied, 467 U.S. 1260, 104 S.Ct. 3555, 82 L.Ed.2d 856 (1984). Before the appeal of the petitioner, the Illinois Supreme Court had determined in two cases that such argument was reversible error. *See People v. Walker*, 91 Ill.2d 502, 64 Ill.Dec. 531, 536, 440 N.E.2d 83, 88 (1982); *People v. Szabo*, 94 Ill.2d 327, 68 Ill.Dec. 935, 954, 447 N.E.2d 193, 212 (1983). By contrast, in the petitioner's direct appeal, the Illinois court denied relief because there was "no evidence that the possibility of parole was a factor considered in the jury's deliberations," and because, in the court's view, the prosecutor was simply describing accurately the sentencing choices of the court. *See People v. Del Vecchio*, 105 Ill.2d 414, 86 Ill.Dec. 461, 472, 475 N.E.2d 840, 851 cert. denied, 474 U.S. 883, 106 S.Ct. 204, 88 L.Ed.2d 173 (1985). In *People v. Brisbon*, 106 Ill.2d 342, 88 Ill.Dec. 87, 478 N.E.2d 402 cert. denied, 474 U.S. 908, 106 S.Ct. 276, 88 L.Ed.2d 241 (1985), the court returned to the approach in *Walker*. Again in 1988, the court followed *Walker* when it decided *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 cert. denied, 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988). Yet, when the petitioner's case came before the court again on appeal from the denial of post-conviction relief, the court again denied relief. The court merely noted that "[d]ifferent results were achieved from the different facts." *People v. Del Vecchio*, 129 Ill.2d 265, 135 Ill.Dec. 816, 826, 544 N.E.2d 312, 322 (1989), cert. denied, 494 U.S. 1062, 110 S.Ct. 1540, 108 L.Ed.2d 779 (1990).

Among people condemned to death in Illinois, only Del Vecchio has been required to show that the jury relied upon the prosecutor's remarks about parole. In all other cases, the court has acknowledged that such remarks are prejudicial. This disparate treatment seems especially stark in light of the fact that the prosecutor's statement was made in a case in which there was no possibility of parole. *See* Ill.Rev.Stat. ch. 38, § 1003-3-3(d). This factor was noted by the

court in *Gacho* as making the comment of the prosecutor particularly inappropriate. *Gacho*, 119 Ill.Dec. at 1180, 522 N.E.2d at 1163.

The government argues in its brief that the remark of the prosecutor was an invited response, apparently to the petitioner's remark that part of him believed that he would be able to get out of prison before he was old. This suggestion by the State is speculation. Whether the remark is an invited reply is a matter of state law, and the Supreme Court of the state has chosen not to justify its holding by any reference to that possibility. Nor is it by any means "given" that the Illinois court would have characterized the prosecutor's comments in such terms. *See Brisbon*, 88 Ill.Dec. at 98–99, 478 N.E.2d at 413–14 (stating that, despite the State's allegations that discussion of parole was invited by comments made by defendant's witnesses and by defendant's testimony, the court found the prosecutor's discussion to be a "highly prejudicial over-reaction"). Moreover, Illinois' treatment of the invited response defense is inexplicably murky. Although the principle has been acknowledged in some cases, *see People v. Mack*, 105 Ill.2d 103, 85 Ill.Dec. 281, 293–94, 473 N.E.2d 880, 892–93 (1984), cert. granted and judgment vacated, 479 U.S. 1074, 107 S.Ct. 1266, 94 L.Ed.2d 127 (1987); *Garcia*, 73 Ill.Dec. at 426, 454 N.E.2d at 286, the court has not always relied upon it, *see Szabo*, 68 Ill.Dec. at 953–54, 447 N.E.2d at 211–12. Under these circumstances, we cannot attribute to the Supreme Court of Illinois a rationale that, for reason known only to that bench, it determined ought not be used to justify its ruling in this case.

## C.

As the principal dissent notes, there is a cloud of doubt surrounding this case—a cloud that can be attributed to the lingering fear that one of the basic hallmarks of American justice—evenhandedness—was lacking in this case.[2] The crime was a terrible one and

---

2. It should be noted that the petitioner has raised and preserved without extended argument another "cloud," the allegation that the State was less than frank with the Supreme Court of the United

States in its response to a prior petition for certiorari. The petitioner has advised this court that he considers the matter appropriate for in-

the majority has stressed the stark brutality of the murder in no uncertain terms. In performing our task, however, we must not let the facts of this case become

some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

*Northern Sec. Co. v. United States,* 193 U.S. 197, 400–01, 24 S.Ct. 436, 467, 48 L.Ed. 679 (1904) (Holmes, J., dissenting opinion).

clusion in a petition for certiorari to review the judgment of this court.